******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

AUSTIN HAUGHWOUT *v.* LAURA TORDENTI ET AL.
(SC 20076)

Robinson, C. J., and Palmer, McDonald, Mullins,
Kahn, Ecker and Vertefeuille, Js.

*Syllabus*

The plaintiff, who had been expelled from a state university, sought, inter
alia, a writ of mandamus reinstating him as a student. Specifically, the
plaintiff alleged that the defendants, certain university officials involved
in the decision to expel him, violated his federal constitutional right to
free speech. An investigation conducted by university police revealed
that the plaintiff had identified a particular student as "first on his hit
list," shared digital photographs of a bullet with other students, remarked
that he had loose bullets at home and in his truck, made certain com-
ments about "shoot[ing] up" the university, greeted others by pointing
at them with his hand in the shape of a gun, and bragged to others about
his guns and ammunition. Although students described the plaintiff's
conduct as joking and nonchalant, some of those students indicated a
sense of alarm, concern or fear. As a result of his statements and conduct,
the plaintiff was suspended on an interim basis. Thereafter, the university
commenced formal disciplinary proceedings on the ground that the
plaintiff had violated several provisions of the student code of conduct.
At a hearing before a panel of school administrators and a professor,
the plaintiff largely denied making the statements and gestures attributed
to him. The hearing panel found, however, that the plaintiff was responsi-
ble for the statements and conduct at issue and expelled him from the
university. The hearing panel's decision was upheld after an internal
appeal before the university's associate dean for student affairs. In
disposing of the plaintiff's free speech claim, the trial court concluded,
inter alia, that the plaintiff's statements and gestures were true threats
that were not protected under the first amendment to the United States
constitution because, in light of various mass shootings at schools and
universities around the country, a reasonable person would have inter-
preted the plaintiff's statements and gestures as serious expressions of
an intent to cause harm. The trial court rendered judgment for the
defendants, from which the plaintiff appealed. *Held* that the trial court
correctly determined that the plaintiff's statements and gestures were
true threats that were not protected by the first amendment, and, accord-
ingly, this court affirmed the trial court's judgment: in light of the plain-
tiff's access to ammunition and weapons and his express statements to
that effect, the context provided by the relative frequency of contempo-
rary mass school shootings, and the absence of any facts mooring the
plaintiff's statements to political or artistic hyperbole, a reasonable
person hearing the plaintiff's statements and viewing his gestures would
be more than justified in believing that those expressions constituted
a physical threat; moreover, the plaintiff's claim that his expressions
lacked sufficient specificity to constitute a true threat was inconsistent
with his statement identifying a particular student as being on his hit
list, which was communicated directly to that student, and failed to
account for the fear of indiscriminate and random death resulting from
mass shootings that may be shared by any number of people who fre-
quent a public place that has been the subject of a threat, his claim that
contemporaneous listeners characterized his statements as jokes and
did not understand them to be a serious expression of an intent to cause
harm was undercut by the fact that his statements and conduct were
subsequently reported to the university police, and his claim that his
statements were benign, political hyperbole was unpersuasive because
he had specifically denied making those same statements during the
underlying disciplinary proceedings.

Argued October 17, 2018—officially released July 30, 2019

*Procedural History*

Action seeking reinstatement following the plaintiff's

expulsion from Central Connecticut State University, and for other relief, brought to the Superior Court in the judicial district of New Britain, where the court, *Hon. Joseph M. Shortall*, judge trial referee, granted in part the defendants' motion to dismiss certain counts of the complaint; thereafter, the case was tried to the court, *Hon. Joseph M. Shortall*, judge trial referee, who, exercising the powers of the Superior Court, rendered judgment for the defendants, from which the plaintiff appealed. *Affirmed.*

*Mario Cerame*, for the appellant (plaintiff).

*Ralph E. Urban*, assistant attorney general, with whom, on the brief, was *George Jepsen*, former attorney general, for the appellees (defendants).

*Rebecca E. Adams* filed a brief for the Connecticut Association of Boards of Education as amicus curiae.

*Opinion*

ROBINSON, C. J. In this appeal, we consider the limits of free speech on a public university campus in light of recent history that has led federal and state courts to describe threats of gun violence and mass shootings as the twenty-first century equivalent to the shout of fire in a crowded theater once envisioned by Justice Oliver Wendell Holmes, Jr.[1] See, e.g., *Ponce* v. *Socorro Independent School District*, 508 F.3d 765, 772 (5th Cir. 2007); *Milo* v. *New York*, 59 F. Supp. 3d 513, 517 (E.D.N.Y. 2014); *In re A.S.*, 243 Wis. 2d 173, 194, 626 N.W.2d 712 (2001). The plaintiff, Austin Haughwout, brought the present action seeking to challenge his expulsion from Central Connecticut State University (university). The plaintiff now appeals[2] from the judgment of the trial court in favor of the defendants, Laura Tordenti, Ramón Hernández, Christopher Dukes, and Densil Samuda, the university officials involved in that decision.[3] On appeal, the plaintiff claims that the trial court incorrectly determined that the various statements and gestures with respect to gun violence and mass shootings that led to his expulsion from the university were true threats that are not protected by the first amendment to the United States constitution, rather than hyperbolic and humorous statements on a matter of public concern. Although a public university campus is a unique forum for the free exchange of controversial, unpopular, and even offensive ideas, we nevertheless conclude that the plaintiff's statements and gestures were true threats. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, as found by the trial court,[4] and procedural history. "On September 17, 2015, a student at [the university] (complainant) went to the headquarters of the campus police to report a 'suspicious incident' at the student center. [The complainant] provided a written statement in which he said that [the plaintiff] 'made verbal cues discussing the physical harm of another [university] student,' identified the other student as 'first on his hit list,' showed digital [photographs] of a bullet on his cell phone, and 'remarked that he had loose bullets at home and in his truck.' The complainant said he did not know [the plaintiff], but the statements were made in his presence. The complainant further reported that [the plaintiff] had never shown any weapons on his person, and that he has 'a habit of making hand gestures in the shape of handguns as a common gesture.'

"On September 21, 2015, the campus police interviewed another [university] student who had known [the plaintiff] since the spring semester [of] 2015 and hung around with him in a group that met at the student center. That student recounted statements by [the plaintiff] that 'someone should shoot up this school' or 'I should just shoot up this school.' [The plaintiff] was

'always' talking about guns and ammunition and 'greets everyone by pointing at them with his hand in the shape of a gun.' This student reported that [the plaintiff] had said to him that he was [the plaintiff's] 'number one target,' 'number one on my list.' [The plaintiff] 'brags constantly about his guns and ammunition, shows off pictures and boasts about wanting to bring a gun to school.' This student described these statements by [the plaintiff] as made 'jokingly' and that the group in which they hung around dismissed what he said as a joke.

"On the same day, the campus police reinterviewed the complainant, who repeated his allegations of September 17. Although [the complainant], too, described [the plaintiff's] statements as having been made 'jokingly,' he was 'alarmed' by them, had started avoiding [the plaintiff], left the student center when [the plaintiff] arrive[d] and was 'afraid for everyone's safety.'

"On September 22, the campus police interviewed a third student who related that he had heard [the plaintiff] during the preceding week state 'something like "might as well shoot up the place." ' While this student described [the plaintiff's] statement as having been made 'nonchalantly,' he was 'concerned about the context of [the plaintiff's] exclamation' because [the plaintiff] had been 'upset about something' when he made it.

"The campus police interviewed [the plaintiff] on September 22, 2015, as well. While he acknowledged talking about guns a lot, he denied ever saying anything about shooting up the school, stating that 'he knows better than to mention anything like that.' He attributed the complaints against him to his position on gun rights.

"After interviewing [the plaintiff], the campus police called two of the persons they had previously interviewed and inquired why they had not contacted police upon hearing [the plaintiff's] alleged remarks about 'shooting up the school.' One said he had been told by others who heard the remark to 'take it as a joke and ignore [the plaintiff]'; the other stated that [he] 'didn't take it seriously but . . . was kind of concerned.'

"[Samuda], a detective with the campus police, participated in this investigation. At its conclusion, on September 22, he applied for an arrest warrant charging [the plaintiff] with the crime of threatening in the second degree, in violation of General Statutes § 53a-62. The state's attorney declined the application, informing . . . Samuda that probable cause for that crime was lacking.[5] [Samuda] reported the results of his investigation to [Dukes, the university's director of student conduct, and] provided him with copies of the police reports. On October 1, 2015, [the plaintiff] was placed on an interim suspension by Hernández, [the university's associate dean for student affairs, because of] 'alleged behavior within our community.' " (Footnotes added and omitted.)

Following an investigation by Dukes, the university commenced disciplinary proceedings against the plaintiff on the ground that his actions had violated four separate provisions of the university's student code of conduct prohibiting the following: physical assault, intimidation, or threatening behavior; harassment; disorderly conduct; and offensive or disorderly conduct. A hearing was held before a panel consisting of two administrators and a professor, at which the plaintiff largely denied making the statements and gestures attributed to him. See footnote 18 of this opinion. The hearing panel found, however, that the plaintiff was responsible on all charges, and decided to expel him from the university's campus. The hearing panel's decision to expel the plaintiff from the university[6] was subsequently upheld after an internal appeal.[7]

The plaintiff subsequently brought this action seeking a declaratory judgment, injunctive relief, and damages. The plaintiff also sought a writ of mandamus reinstating him as a student at the university, expungement of misconduct allegations from his record, and a refund of tuition and fees that had been withheld by the defendants. The plaintiff claimed that his expulsion constituted a breach of contract, contravened an implied covenant of duty of good faith and fair dealing, and violated his state and federal constitutional rights to due process of law and to freedom of speech.

After a hearing,[8] the trial court issued a memorandum of decision in which it rejected the plaintiff's contractual and due process claims,[9] and further concluded that the defendants did not violate the plaintiff's free speech rights under the federal and state constitutions. The trial court concluded that the plaintiff's "statements and gestures while in the student center at [the university] fit the definition of 'true threats,' " and "were certainly not statements that sought 'to communicate a belief or idea.' "[10] Because the plaintiff had "denied almost all of these statements," and, therefore, "the record contains no direct evidence from him as to his intentions in making them"; see footnote 17 of this opinion; the trial court relied on their content and "his repeated utterances of them in a public place like the student center," and found that the plaintiff "meant to 'communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals' . . . namely, the students at [the university]. Whether he actually intended to carry through on the threat is unknown and immaterial." (Citation omitted.) Given the "spate" of mass shootings at schools and universities around the country, the trial court determined that "a reasonable person . . . would have seen that such repeated statements would be interpreted by the students to whom and in whose presence he made them as 'serious expressions of intent to harm or assault.' . . . And, although some

of the students treated [the plaintiff's] statements as a joke, at least some of them who heard these threats were 'alarmed' and 'concerned' about them and in some cases changed their behavior; e.g., coming less often to the student center because of [the plaintiff's] statements." (Citation omitted; footnote omitted.) Accordingly, the trial court rendered judgment for the defendants. This appeal followed.[11]

On appeal, the plaintiff, emphasizing that the first amendment "doesn't protect just the good jokes," claims that the statements, gestures, and images that he made were not true threats and, therefore, were a constitutionally protected exercise of his right to free speech.[12] Relying heavily on the principles elucidated in our decision in *State* v. *Krijger*, 313 Conn. 434, 97 A.3d 946 (2014), as well as the United States Supreme Court's decision in *Watts* v. *United States*, 394 U.S. 705, 89 S. Ct. 1399, 22 L. Ed. 2d 664 (1969), the plaintiff contends that his statements were not true threats but, instead, were protected "jokes" or " 'political hyperbole' " akin to the satiric works of Lenny Bruce, which constituted "dark humor" with long roots in Western literature. The plaintiff emphasizes that, although it was "possible to construe [his] statements as a threat," the "more plausible interpretation is benign," given the context in which "[e]veryone who heard the statements understood them to be made jokingly," and "[n]o contemporaneous listener understood [them] to be a serious expression of an intent to cause harm." Relying on his explanations before the hearing panel to provide additional context, the plaintiff emphasizes that "none [of the listeners] reacted in a manner consistent with a serious expression of an intent to shoot members of the school community" and puts his "[j]oking that someone should shoot up the school" in the same constitutionally protected "nasty bucket as a dead baby joke." The plaintiff further argues that his statements lacked the particularity necessary to be a true threat, and that his statements—whether examined as a whole or in a "more granular way"—were ambiguous and, therefore, not true threats.

In response, the defendants argue that the plaintiff's statements and gestures were true threats under *State* v. *Krijger*, supra, 313 Conn. 434, because "a reasonable hearer or receiver of the expressive conduct would believe [that he] was expressing a serious intent to commit an act of unlawful violence." Relying on, inter alia, *Doe* v. *Pulaski County Special School District*, 306 F.3d 616 (8th Cir. 2002), and *State* v. *DeLoreto*, 265 Conn. 145, 827 A.2d 671 (2003), the defendants contend that the plaintiff's comments and gestures are reasonably understood as a true threat, given his access to weapons and the fact that the students who witnessed them evinced their fear insofar as some stopped going to the student center, others went to the police, and, "while several of them verbally agreed to provide testi-

mony or information at [the plaintiff's] campus disciplinary proceeding, only one showed up, and he became notably agitated and fearful, and refused to appear before the disciplinary panel when he learned [the plaintiff] would be present, leaving abruptly." The defendants argue that, although the plaintiff's threats were directed at particular individuals, including one student whom he had described as his " 'number one target,' " the nature of the threats struck more broadly because they implicated the randomness that is the "fear inducing phenomenon" of mass shootings. The defendants also contend that the record does not support the plaintiff's contention that his statements and gestures were humor, political satire, or political expression with respect to gun control, largely because he "did not make any such claims before the [university's] hearing panel, instead claiming that there was something about his personality that caused people to lie about him and his activities, and that the evidence against him was the result of a personal vendetta by a particular student to have him expelled." Ultimately, the defendants claim that the plaintiff's "words and gestures, as received by reasonable hearers or recipients, did not relate to any important public policy issue, and [the plaintiff's] manner of expression, reasonably heard as true threats, was clearly out of bounds on a college campus . . . ." We agree with the defendants and conclude that the trial court properly found that the plaintiff's statements and gestures were true threats not protected by the first amendment.

"The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 448–49; see also *United States* v. *Alvarez*, 567 U.S. 709, 716, 132 S. Ct. 2537, 183 L. Ed. 2d 574 (2012) (observing that "content-based restrictions on speech have been permitted, as a general matter, only when confined to the few historic and traditional categories

[of expression] long familiar to the bar," including "advocacy intended, and likely, to incite imminent lawless action," obscenity, defamation, "speech integral to criminal conduct," "so-called fighting words," child pornography, fraud, true threats, and "speech presenting some grave and imminent threat the government has the power to prevent . . . although a restriction under the last category is most difficult to sustain" [citation omitted; internal quotation marks omitted]).

The first amendment permits states to restrict[13] true threats, which "encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . .

"Thus, we must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . . In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." (Citations omitted; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 449–50; see also *Virginia* v. *Black*, 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); *Watts* v. *United States*, supra, 394 U.S. 707–708.

"[T]o ensure that only *serious* expressions of an intention to commit an act of unlawful violence are punished, as the first amendment requires, the state [actor] must do more than demonstrate that a statement *could* be interpreted as a threat. When . . . a statement is susceptible of varying interpretations, at least one of which is nonthreatening, the proper standard to apply is whether an objective listener would readily interpret the statement as a real or true threat; nothing less is sufficient to safeguard the constitutional guarantee of freedom of expression. To meet this standard [the state actor is] required to present evidence demonstrating that a reasonable listener, familiar with the entire factual context of the defendant's statements, would be highly likely to interpret them as communicating a genu-

ine threat of violence rather than protected expression, however offensive or repugnant." (Emphasis in original.) *State* v. *Krijger*, supra, 313 Conn. 460; see also *State* v. *Taupier*, 330 Conn. 149, 173, 193 A.3d 1 (2018) (true threat inquiry is objectively judged from perspective of reasonable listener, and first amendment does not require speaker to have specific intent to terrorize), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019). Because the true threats doctrine has equal applicability in civil and criminal cases, case law from both contexts informs our inquiry. See *New York ex rel. Spitzer* v. *Operation Rescue National*, 273 F.3d 184, 196–97 (2d Cir. 2001).

In determining whether the trial court properly found that the defendant's statements and gestures were true threats, we recognize that, although we ordinarily review findings of fact for clear error, "[i]n certain first amendment contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review." (Citation omitted; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 446–47; see also *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 284–86, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). We emphasize, however, that "the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted a true threat, we accept all subsidiary credibility determinations and findings that are not clearly erroneous." *State* v. *Krijger*, supra, 447; see id., 447–48 (noting that independent review is applied to version of remarks at issue that fact finder credited).

To frame our independent analysis, we note that the trial court concluded that the student witnesses' statements supported findings that the plaintiff (1) "made frequent shooting hand gestures as a form of greeting to students in the student center," (2) "with his hand in a shooting gesture, [he] aimed at students and made firing noises as they were walking through the student center," (3) "wondered aloud how many rounds he would need to shoot people at the school and referred to the fact that he had bullets at home and in his truck," (4) "showed off pictures of the guns he owned and boasted about bringing a gun to school," (5) "referred specifically and on more than one occasion to his 'shooting up the school,' " (6) "during a test of the school's alarm system stated that 'someone should really shoot up the school for real so it's not a drill,' " (7) "named as his 'number one target' a particular student in the student center," and (8) "made specific reference to a shooting at an Oregon community college where several students had been killed and wounded, stating that the Oregon shooting had 'beat us.' " Having reviewed the record, we agree with the trial court's conclusion that the totality of the plaintiff's comments and gestures would reasonably be understood to be a true threat of gun violence at the university.[14]

Although most of the plaintiff's comments were individually not an "explicit threat," that phrasing does not render them protected speech, because "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [statutes proscribing true threats] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat. . . . Thus, a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening." (Citation omitted; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 452–53. Put differently, even veiled statements may be true threats. See *United States* v. *Dillard*, 795 F.3d 1191, 1200–1201 (10th Cir. 2015) (District Court incorrectly concluded that defendant's statement in letter to abortion clinic physician that "an unidentified 'someone' might place explosives under [physician's] car" was not true threat because ambiguous statement without "direct statement of personal intent" may be true threat given other factors, including local history of violence); *United States* v. *Bly*, 510 F.3d 453, 456–59 (4th Cir. 2007) (letter sent by former doctoral student was true threat to university board members and academic officers when it made demands and [1] stated that " 'bullets are far cheaper and much more decisive' " than legal action as

" '[a] person with my meager means and abilities can stand at a distance of two football fields and end elements of long standing dispute with the twitch of my index finger,' " [2] stated that " 'it would be a shame to brutalize [thesis advisors] in order to guarantee that I receive a hearing of my story and a form of justice,' " and [3] enclosed "copies of firearms practice targets with bullet holes near their centers," despite disclaimer stating that " '[t]hese comments are not to be interpreted as illegal brandishing of a firearm, blackmail, or extortion' "); see also *United States* v. *Voneida*, 337 Fed. Appx. 246, 248–49 (3d Cir. 2009) (upholding jury finding that college student transmitted threatening communication in violation of 18 U.S.C. § 875 [c] when he posted, inter alia, following statements on his personal social media page two days after Virginia Tech mass shooting: [1] " 'Someday . . . I'll make the Virginia Tech incident look like a trip to an amusement park' "; [2] "expressed '[shock]' that after the Virginia Tech [shooting] his classmates 'were actually surprised that there are people out there who would shoot them if given the opportunity' "; [3] " 'lost my respect [for] the sanctity of human life' "; and [4] included tributes to Virginia Tech shooter as martyr, with wish that shooter's " 'undaunted and unquenched' wrath would 'sweep across the land,' " particularly given fearful reactions by multiple students at his university and elsewhere who viewed post and contacted police).

Given his express statements that he had access to firearms and ammunition, the plaintiff's statements and gestures—especially when viewed in the context that they provide for each other—are within the realm of those that have been deemed true threats, especially in the contemporary context of school shootings. We find particularly illustrative the decision of the United States Court of Appeals for the Eighth Circuit in *D.J.M.* v. *Hannibal Public School District No. 60*, 647 F.3d 754, 756–57 (8th Cir. 2011), which considered whether statements sent by a public school student to another student via instant message were true threats, rendering his suspension not a first amendment violation. In *D.J.M.*, the court concluded that the following statements, when viewed in their entirety, were reasonably viewed as "serious expressions of intent to harm," rather than "in jest out of teenage frustration": [1] that the student admitted "he was depressed at being rejected by a romantic interest; [2] his 'access to weapons' which made his threats 'believable'; [3] [the instant message recipient's] report that [the student] said he intended to take a gun to school to shoot everyone he hates and then himself; [4] his expressed 'desire to kill at least five classmates'; [5] his telling [the instant message recipient he] 'wanted [their town] to be known for something'; and [6] [the instant message recipient's] growing concern that caused her to contact a trusted adult about his threats." Id., 762–63. The court rejected

the student's reliance on *Watts* v. *United States*, supra, 394 U.S. 705, and held that a reasonable recipient would find these statements threatening—despite the fact that the immediate recipient responded humorously with "lol"[15]—because the student had described individual targets of his threat, indicated his access to a .357 Magnum that he could borrow from a friend, and the recipient was concerned enough to tell a trusted adult, who informed school officials, later resulting in the student's suspension and inpatient psychiatric evaluation. *D.J.M.* v. *Hannibal Public School District No. 60*, supra, 758, 762–64. The Eighth Circuit concluded that, in "light of the [school district's] obligation to ensure the safety of its students and reasonable concerns created by shooting deaths at other schools such as [those in] Columbine and the Red Lake [Indian] Reservation . . . the [school district] did not violate the [f]irst [a]mendment by notifying the police about [the student's] threatening instant messages and subsequently suspending him after he was placed in juvenile detention." Id., 764. Put most succinctly, the court emphasized that the first amendment "did not require the [school district] to wait and see whether [the student's] talk about taking a gun to school and shooting certain students would be carried out." Id.

Numerous other cases support the reasonableness of concern over threats of gun violence in the educational setting because "knowledge by the target of a threat that the defendant had the means to carry out the threat can support the inference that the target would reasonably interpret the threat to be serious." (Emphasis omitted.) *State* v. *Taupier*, supra, 330 Conn. 183; see *Lovell* v. *Poway Unified School District*, 90 F.3d 367, 372–73 (9th Cir. 1996) (concluding that "any person could reasonably consider the statement '[i]f you don't give me this schedule change, I'm going to shoot you,' made by an angry teenager [to school guidance counselor], to be a serious expression of intent to harm or assault," especially "when considered against the backdrop of increasing violence among school children today"); *People* v. *Diomedes*, 13 N.E.3d 125, 134–39 (Ill. App. 2014) (e-mail sent by student to anti-bullying activist, although " 'an expression of teenage despair,' " was true threat because they did not have confidential therapeutic relationship, student expressed wish for certain "specific individuals to die and suffer," student had history of making at least one prior threat, and there was no indication that statement was made in hyperbole or jest), appeal denied, 39 N.E.3d 1006 (Ill. 2015); *State* v. *Trey M.*, 186 Wn. 2d 884, 888–90, 906–907, 383 P.3d 474 (2016) (concluding that juvenile's statements to his therapist, later repeated to police officer, that he planned to take his grandfather's nine millimeter gun from a cabinet and bring it to school to shoot boys who had bullied and teased him, and if he could not get gun to use bombs, was true threat given specificity of access

to weapons, fear expressed by boys who were on juvenile's "hit list," juvenile's confession to making bombs, and communication of time and location of planned shooting), cert. denied,      U.S.      , 138 S. Ct. 313, 199 L. Ed. 2d 207 (2017); *In re A.S.*, supra, 243 Wis. 2d 182–83, 194 (juvenile's statements, made in "very matter of fact manner" while playing video games at local youth center, that he would bring guns and "do something similar" to Columbine school shooting, while sparing some classmates and killing and raping certain specified teachers and police officers, were true threats when listeners were frightened, and there was no indication in context or statements that they were "hyperbole, jest, or political dissent"); see also *Feminist Majority Foundation* v. *Hurley*, 911 F.3d 674, 691–92 (4th Cir. 2018) (rejecting university's defense in Title IX case that first amendment "circumscribed" its ability to respond to "online harassment and threats suffered" by member of campus women's organization, because threatening online messages were true threats, including those threatening to " 'euthanize,' " kill, and sexually assault organization's members "where the backdrop of the threatening messages is a campus environment purportedly conducive to sexual assault, and those messages target persons by name and location"); *Walker* v. *Suarez*, United States District Court, Docket No. 15-CV-01960 (RBJ) (D. Colo. January 26, 2016) (threat to shoot down helicopter was true threat when it was made against specific individual on multiple occasions and by person with "access to guns" who had purchased rifle scope on same day), appeal dismissed, United States Court of Appeals, Docket No. 16-1055 (10th Cir. May 02, 2016).

The plaintiff also contends that the requisite particularity is lacking, because "[n]o one indicated a particularized fear. All concern and worry [were] generalized." We disagree. First, this argument is inconsistent with the trial court's finding that the plaintiff had in fact identified one specific student as " 'number one' " on the plaintiff's " 'hit list,' " and the statement had been communicated to that student directly. Although that student believed that the statement was made " 'jokingly,' " he nevertheless was " 'alarmed' " by it and was sufficiently concerned for everyone's safety to contact the university police. Second, this argument reads too narrowly the boilerplate proposition that a true threat is "a serious expression of an intent to commit an act of unlawful violence to a *particular* individual or group of individuals." (Emphasis added; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 449. The fear of indiscriminate and random death and injury that results from mass shootings, like Sandy Hook, Virginia Tech, and Columbine, transcends any one specific individual and is shared by any one of the many people who must frequent a public place—such as a university student union—that has been the subject of a threat.

See *State* v. *Pelella*, 327 Conn. 1, 11, 16–17, 170 A.3d 647 (2017) ("[A] threat need not be imminent to constitute a constitutionally punishable true threat" because "a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . . Indeed, [t]hreatening speech . . . works directly the harms of apprehension and disruption, whether the apparent resolve proves bluster or not and whether the injury is threatened to be immediate or delayed." [Citation omitted; internal quotation marks omitted.]).

Indeed, the relative frequency of these mass shootings informs the reasonableness of viewing the plaintiff's remarks, which were apparently unmoored to political or other discourse, as true threats. See, e.g., *D.J.M.* v. *Hannibal Public School District No. 60*, supra, 647 F.3d 764 (noting school district's "obligation to ensure the safety of its students and reasonable concerns created by shooting deaths at other schools such as [those in] Columbine and the Red Lake [Indian] Reservation"); *Doe* v. *Pulaski County Special School District*, supra, 306 F.3d 625–26 and n.4 (letter authored by student expressing his "wish to sodomize, rape, and kill" his ex-girlfriend was true threat justifying suspension "in the wake of Columbine and Jonesboro," rendering it "untenable" that school officials learning about the letter "would not have taken some action based on its violent and disturbing content"). It is no wonder that, especially in an educational setting, threatening statements about mass shootings are the equivalent of, "in the words of [Justice] Holmes, [a cry of] 'fire' in a crowded theater." *In re A.S.*, supra, 243 Wis. 2d 194; see, e.g., *Ponce* v. *Socorro Independent School District*, supra, 508 F.3d 772; *Milo* v. *New York*, supra, 59 F. Supp. 3d 517; see also *State* v. *Parnoff*, 329 Conn. 386, 426, 186 A.3d 640 (2018) (*Kahn, J.*, concurring) (recognizing that, in current times, "the threat of gun violence is tasteless, shameful, and all too real").

The plaintiff argues, however, that "[n]o contemporaneous listener understood the statements to be a serious expression of an intent to cause harm," and that "[e]veryone who heard the statements understood them to be made jokingly." We disagree with the plaintiff's reading of the record. Although the narrative in the police reports that were evidence before the hearing panel indicates that some students elected to treat the plaintiff's remarks as made in jest, that narrative also indicates that some of those same students nevertheless were sufficiently perturbed to contact the university police, with one complaining witness apparently so fearful for his safety that he refused to appear as a witness at the university's disciplinary hearing. Given the objective nature of the inquiry, the listener's reaction of concern or fear need not be dramatic or immediate, and the apparently mixed emotions of the listeners

are not dispositive. See *D.J.M.* v. *Hannibal Public School District No. 60*, supra, 647 F.3d 758, 762–63 (teenage recipient of instant message with threats responded "lol," but was also concerned enough to tell trusted adult); *Lovell* v. *Poway Unified School District*, supra, 90 F.3d 372–73 (The court noted that a school guidance counselor had "stated repeatedly that she felt threatened" when confronted, and that "[t]he fact that she chose not to seek help instantly is not dispositive. She did report the conduct to [an assistant principal] within a few hours, before she went home that day. Exhibiting fortitude and stoicism in the interim does not vitiate the threatening nature of [the student's] conduct, or [the guidance counselor's] belief that [the student had] threatened her."); see also *State* v. *Taupier*, supra, 330 Conn. 158–59, 191–92 (reader of e-mail containing threat to judge mentioned her concern to several people, but waited several days and gathered additional information before disclosing it to attorney for further action).

To this end, we also disagree with the plaintiff's argument that his statements and gestures were ambiguous and more properly interpreted as benign jokes or political hyperbole that are protected by the first amendment, including the numerous innocent explanations that he proffers for them on a more granular basis, such as the existence of a gun emoji to justify his use of images of firearms and ammunition. These arguments reflect the plaintiff's attempts to seek shelter under the United States Supreme Court's landmark decision in *Watts* v. *United States*, supra, 394 U.S. 706, the leading true threats decision in which a Vietnam War protestor, after being drafted, stated at a public rally in Washington, D.C., three years after the assassination of President John F. Kennedy, that, " '[i]f they ever make me carry a rifle the first man I want to get in my sights is L. B. J.' " In concluding that this statement was political hyperbole protected by the first amendment, rather than a true threat, the Supreme Court noted the conditional nature of the statement, and that it was made at a public rally on a matter of great public concern to an audience response of laughter. Id., 707–708. The Supreme Court emphasized that even "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials" should not be prohibited given the "background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open . . . ." (Internal quotation marks omitted.) Id., 708; see also *State* v. *Krijger*, supra, 313 Conn. 450. Accordingly, we agree with the plaintiff—in theory—that not all references to school violence necessarily will constitute true threats unprotected by the first amendment.[16]

The plaintiff's attempt to cast the present case as one of political hyperbole and humor akin to *Watts* is particularly unpersuasive in light of his strategy before

the trial court and university hearing tribunal. Specifically, the plaintiff expressly elected to forgo a formal bench trial by allowing the trial court to rely on the facts found during the university's disciplinary proceedings and an earlier motion hearing that had focused on certain due process issues not relevant to the present appeal.[17] The evidence contained in that record provides virtually no factual support for his claim that his statements were political hyperbole or poorly stated satire. Compounding this is the fact that the record reveals that the plaintiff's elected strategy before the university's hearing panel consisted of (1) denying outright that he made the statements at issue, and (2) framing the university proceedings against him as a political and personal persecution,[18] rather than defending the specific statements as artistic or political hyperbole.[19] Put differently, the plaintiff's prior disavowal of the statements is inconsistent with his claim that they were spoken to make a political point. Accordingly, the record, although adequate for review of the plaintiff's constitutional claims, simply does not contain factual support for his argument that his statements and gestures would reasonably be understood as political hyperbole or humor, rather than a true threat.[20]

We acknowledge that "[f]reedom of speech needs breathing space to survive. . . . And vigilant protection of [f]irst [a]mendment rights is nowhere more vital than at public universities, which are peculiarly the marketplace of ideas. . . . For those reasons. . . policies that formally or informally suppress protected expression at public universities raise serious [f]irst [a]mendment concerns. . . . And while we are mindful of universities' obligations to address serious discrimination and harassment against their students, we also are attentive to the dangers of stretching policies beyond their purpose to stifle debate, enforce dogma, or punish dissent."[21] (Citations omitted; internal quotation marks omitted.) *Abbott* v. *Pastides*, 900 F.3d 160, 179–80 (4th Cir. 2018), cert. denied, U.S. , 139 S. Ct. 1292, 203 L. Ed. 2d 428 (2019); see also *Healy* v. *James*, 408 U.S. 169, 180, 92 S. Ct. 2338, 33 L. Ed. 2d 266 (1972); *NAACP* v. *Button*, 371 U.S. 415, 433, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963). Nevertheless, in the absence of any facts mooring the plaintiff's statements to political or artistic hyperbole, and given his stated access to weapons and ammunition, a reasonable person hearing the plaintiff's statements and viewing his gestures at a school in the same state as Sandy Hook would be more than justified in understanding his statements as a physical threat to the "great bazaars of ideas" themselves. (Internal quotation marks omitted.) *Doe* v. *Rector & Visitors of George Mason University*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016). Accordingly, we conclude that the trial court correctly determined that the plaintiff's statements were true threats that were not protected by the first amendment.[22]

The judgment is affirmed.

In this opinion the other justices concurred.

[1] *Schenck* v. *United States*, 249 U.S. 47, 52, 39 S. Ct. 247, 63 L. Ed. 470 (1919).

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] At the time of the events underlying the present appeal, Tordenti was vice president for student affairs, Hernández was the associate dean for student affairs, Dukes was the director of student conduct, and Samuda was a detective employed by the university police department.

[4] The trial court did not receive evidence or hear arguments during a formal bench trial in the present case. Instead, with the agreement of the parties, the trial court found facts on the basis of the record of the university's disciplinary proceedings and certain testimony from the plaintiff and Dukes at a pretrial hearing held before the court on August 8, 2016. See footnote 17 of this opinion and accompanying text.

[5] The trial court stated that it "consider[ed] the prosecutor's declination of little moment. The requirements for establishing probable cause for the elements of threatening in the second degree, in violation of § 53a-62, bear no necessary relationship to the requirements for taking disciplinary action for a violation of the [university's student code of conduct]."

[6] In addition to his expulsion from the university, the plaintiff was also "permanently banned from returning to," or attending events on, the premises of the other three four year university campuses in the Connecticut State College and University system.

[7] Specifically, the plaintiff appealed from the hearing panel's decision to Tordenti, the university's vice president for student affairs, who, in turn, assigned Hernández to hear the appeal. After a hearing, Hernández issued a decision rejecting the plaintiff's claims that the hearing did not comply with the university's student code of conduct and that "the sanction of [e]xpulsion . . . was not appropriate . . . ."

[8] See footnotes 4 and 17 of this opinion.

[9] We note that, on appeal, the plaintiff does not challenge the trial court's determinations that the university's "disciplinary procedures did not violate [his] due process rights under either the federal or state constitution and [that the university] adhered to the disciplinary procedures prescribed by the [university's student code of conduct]," and, therefore, no breach of contract or the duty of good faith and fair dealing occurred in that respect.

[10] A detailed listing of the statements and gestures that the trial court determined were a true threat is set forth in the text accompanying footnote 14 of this opinion.

[11] On November 16, 2018, after the oral argument in the present appeal, we invited numerous organizations and institutions, namely, the American Civil Liberties Union of Connecticut, the Connecticut Conference of Independent Colleges, the University of Connecticut, several sections of the Connecticut Bar Association, Yale University, and the Connecticut Association of Boards of Education, to file briefs as amici curiae. Only the Connecticut Association of Boards of Education accepted our invitation, and we are grateful for its participation.

[12] We note that the plaintiff, although attempting to reserve and "not [waive]" the right to do so, has specifically declined to brief a claim, in accordance with *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992), that his speech is entitled to greater protection under article first, §§ 4, 5 and 14, of the Connecticut constitution. This absence was based on the "good faith" belief of his counsel that, because "the established federal standard is clearly dispositive on this factual record . . . this case does not provide occasion to define any daylight between the state and federal constitutions on the issue of true threats." Consistent with his attempted reservation, but inconsistent with his no "daylight" assertion, the plaintiff's reply brief raises a claim that, under the state constitution, the speaker must have the specific intent to speak threateningly for a statement to be a true threat, which he casts as a response to an issue that the defendants "pressed" in their brief. As is reflected in our April 4, 2018 order granting the defendants' motion to strike the corresponding pages of the plaintiff's reply brief, we decline to countenance this approach, which violates the well settled principle that claims may not be raised for the first time in a reply brief. See, e.g., *Isabella D.* v. *Dept. of Children & Families*, 320 Conn. 215, 236 n.19, 128 A.3d 916, cert. denied, U.S. , 137 S. Ct. 181, 196 L. Ed. 2d 124 (2016); see also *Bennett* v. *New Milford Hospital, Inc.*, 300 Conn. 1, 32–33, 12 A.3d 865

(2011) (declining to consider claim that statute violates separation of powers provision under state constitution because it was unpreserved and raised for first time under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 [1989], in reply brief).

Beyond this procedural bar to review of the plaintiff's state constitutional claim, we recently rejected its merits in *State* v. *Taupier*, 330 Conn. 149, 193 A.3d 1 (2018), cert. denied,      U.S.      , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019), in which we concluded that neither the federal nor the state constitution require the speaker to have the specific intent to threaten in order for a statement to be deemed an unprotected true threat. See id., 173–74 (joining those federal courts that have concluded that true threat under first amendment does not require proof of specific intent); id., 174–76 (concluding after *Geisler* analysis that true threat under state constitution does not require proof of specific intent).

[13] It is undisputed that, given its status as a public institution of higher education, the university's enforcement of its student code of conduct via the commencement of disciplinary proceedings against the plaintiff constituted state action for purposes of the first amendment. See, e.g., *IOTA XI Chapter of Sigma Chi Fraternity* v. *George Mason University*, 993 F.2d 386, 393 (4th Cir. 1993); see also *Furumoto* v. *Lyman*, 362 F. Supp. 1267, 1276–80 (N.D. Cal. 1973) (citing cases and rejecting argument that state benefits and regulation of Stanford University rendered it arm of state for purposes of action under 42 U.S.C. § 1983 claiming that disciplinary action violated students' first amendment rights).

[14] We note that the multiple statements and gestures made at different times in this case differ from those in our previous true threat cases, which considered the import of statements or gestures made in the course of a single incident. See, e.g., *State* v. *Taupier*, supra, 330 Conn. 156–57 (single e-mail to judge containing multiple threatening statements); *State* v. *Pelella*, 327 Conn. 1, 4, 170 A.3d 647 (2017) (single threat made during domestic dispute between brothers); *State* v. *Krijger*, supra, 313 Conn. 439–41 (single in-person reference to injuries previously suffered by listener's son made during angry altercation); *State* v. *Cook*, 287 Conn. 237, 240–41, 947 A.2d 307 (threat with table leg), cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008); *State* v. *DeLoreto*, supra, 265 Conn. 156–58 (statements to police officers on separate occasions formed independent bases for multiple charges). In contrast to these cases, the present case largely turns on the sum of the parts of the plaintiff's statements and gestures made over a relatively extended period of time.

[15] We note that the abbreviation " 'lol' means the speaker is 'laughing out loud.' " *D.J.M.* v. *Hannibal Public School District No. 60*, supra, 647 F.3d 758.

[16] Consistent with *Watts*, our research reveals that not every reference to the topics of violence or shootings in the school setting—even the troubling and offensive ones—will rise to the level of a true threat. Some references are, for example, overtly political speech. See *Ross* v. *Jackson*, 897 F.3d 916, 918, 922 n.7 (8th Cir. 2018) (gun control advocate did not commit true threat by asking, " '[w]*hich one do I need to shoot up a kindergarten*' " on Facebook meme with numerous pictures of firearms and their proffered uses because comment "directly paralleled the language of the meme" and "was in the form of a rhetorical question, which identified no school where a shooting would happen" [emphasis added]).

Other school violence references, while disturbing, are made in creative or artistic contexts that lack other indicia of a true threat. See, e.g., *In re George T.*, 33 Cal. 4th 620, 624, 635–38, 93 P.3d 1007, 16 Cal. Rptr. 3d 61 (2004) (poem authored by high school student in honors English class "labeled 'Dark Poetry,' which recites in part, 'I am Dark, Destructive, & Dangerous. I slap on my face of happiness but inside I am evil!! For I can be the next kid to bring guns to kill students at school. So parents watch your children cuz I'm BACK!!' " was not criminal threat because context provided no indicia of threat, such as animosity between author and fellow student to whom he gave poem, or other "threatening gestures or mannerisms"); *In re Douglas D.*, 243 Wis. 2d 204, 213–14, 234–35, 626 N.W.2d 725 (2001) (noting that thirteen year old boy's story depicting teacher's death was not true threat when it was phrased in third person, contained "hyperbole and attempts at jest," and was written in "the context of a creative writing class," and opining that case would be different if boy had "penned the same story in a math class, for example, where such a tale likely would be grossly outside the scope of his assigned work").

Beyond artistic and political statements utilizing the imagery of mass shootings and violence, some references are just sophomoric attempts at

humor—which, as the plaintiff points out, are protected as "[d]istasteful and even highly offensive communication does not necessarily fall from [f]irst [a]mendment protection as a true threat simply because of its objectionable nature." *J.S.* v. *Bethlehem Area School District*, 569 Pa. 638, 659, 807 A.2d 847 (2002); see also *Burge* v. *Colton School District 53*, 100 F. Supp. 3d 1057, 1060, 1069 (D. Or. 2015) (eighth grade student's comment on Facebook page, that " 'haha [teacher] needs to be shot,' " was not true threat because settings were not visible to school faculty or staff, and were understood by "audience as critique of [teacher's] skills and not the serious expression of intent to harm her," and because there was no evidence of access to weapons or history of violence); *Murakowski* v. *University of Delaware*, 575 F. Supp. 2d 571, 590–92 (D. Del. 2008) (college student's "racist, sexist, homophobic, insensitive, degrading [online writings that] contain graphic descriptions of violent behavior," such as raping and murdering women "like '[O.J.] Simpson' and kill[ing] through his black gloves," were not true threats because, although they were "sophomoric, immature, crude and highly offensive in an alleged misguided attempt at humor or parody," they were not directed to "specific individuals, a particular group or even to women on . . . campus," and were visible on a public website for more than one year); *State* v. *Metzinger*, 456 S.W.3d 84, 96–97 (Mo. App. 2015) (tweets about sending pressure cookers to Boston and references to Boston Marathon bombing were "tasteless and offensive" but not true threats when context, including hashtags about 2013 World Series and St. Louis Cardinals, "reveal that they were made in the context of [a] sports rivalry, an area often subject to impassioned language and hyperbole"); *C.G.M.*, *II* v. *Juvenile Officer*, 258 S.W.3d 879, 880–83 (Mo. App. 2008) (twelve year old juvenile's statement to friend that " 'he may get dynamite from his dad for his birthday' " and asking if he " 'wanted to help him blow up the school' " was not true threat when friend did not fear that threat would be carried out or that juvenile would get dynamite for his birthday, principal did not learn of statement until five months later, and had no concerns about safety); *J.S.* v. *Bethlehem Area School District*, supra, 657–59 (applying *Watts* and concluding that middle school student's posting on his " 'Teacher Sux' " web page, which asked "why [the teacher] should die, show[ing] a picture of [the teacher's] head severed from her body and solicit[ed] funds for a hitman," was not true threat but, instead, was "sophomoric [and] degrading" humor when considered in "full context," including comedic and profane references, comparison of teacher to Adolf Hitler, lack of forwarding address for solicitation of "$20 to help pay for the hitman," humorous reaction of viewers, absence of direct communication to teacher, inaction by school officials for "extended time period," and lack of any reason to believe that student had ability to carry out threats).

[17] At the on-the-record status conference, which the trial court had convened for scheduling purposes in order to expedite a decision in this matter before the spring semester, the parties confirmed that, in light of the plaintiff's withdrawal of his monetary claims against the state, there was no additional evidence for the court to hear subsequent to the hearing on the plaintiff's motion for a preliminary injunction. Counsel for both parties confirmed that summary judgment was not appropriate given factual issues relevant to the due process claim, but also agreed that there were no outstanding factual issues with respect to the first amendment claim, which the plaintiff's attorney argued "remains clear . . . ." The parties then agreed with the trial court's determination that "the record is closed, as far as evidence is concerned," and that they "believe that they have adequately briefed the legal issues and essentially [are] waiting for a decision . . . ."

[18] Specifically, the plaintiff repeatedly denied making the statements at issue in this case, arguing that the accusations against him were "entirely false." The plaintiff repeatedly stated his willingness to wear a body camera on campus, consistent with the "multiple cameras" that he keeps in one of his vehicles, as a result of vendettas and false statements that had been made against him by officers with multiple police departments, which he believed were the politically motivated result of the "flying gun that I had created at my house over the summer."

With respect to the specific allegations, Dukes stated that, during his investigation, the plaintiff had acknowledged having shown digital pictures of bullets to persons on campus and having discussed keeping ammunition inside of a vehicle, but denied making hand gestures in the form of a gun, having a "hit list," or referring to "anyone being his number one target." The plaintiff also stated during the investigation that one of the complaining students made up the allegations in an attempt to have him expelled from

school. The plaintiff declined to question Dukes during the hearing.

During his own statement to the hearing panel, the plaintiff acknowledged having taken a picture of a bullet in one of his vehicles and explained that it was the result of having to search that vehicle for knives and ammunition to ensure compliance with university rules. The plaintiff denied making the shooting gestures with his hand, except for a "few occasions" on which one other student made them "in reply to me or has initiated [similar gestures] with me because I'm always talking about guns . . . ." The plaintiff stated that his remarks about the Oregon shooting were not that "they won or anything like that" but "essentially" that "the Oregon shooting's going to be the one discussed in the media because it was a larger shooting than Newtown." The plaintiff then denied saying that he "should shoot up the school" during testing of the school alarm system, stating that "I had not said anything to that effect. What I had said is imagine if there was an actual emergency where they needed to do it or have used it for real at this time because, you know, it's already being used. So if you had to use it for some reason, not suggesting that there would be any reason, but if you had to use it for some reason, how would you go about communicating the emergency." The plaintiff then stated that he showed off the picture of the bullet because he's "very political" and wanted to make the point that gun control legislation had the absurd result of requiring his expulsion for having ammunition in the vehicle, even if he had nothing with which to fire it. Finally, the plaintiff argued that he viewed one complainant's allegations as politically motivated given what the plaintiff had thought was friendly "political banter" in the student center about topics such as gun control or health care.

[19] We acknowledge the plaintiff's argument that, "[r]eviewing the record as a whole, other statements [therein] indicate the statements were a joke." He cites his "quippish slip [during his opening statement to the hearing panel] comparing the president of the association of schools to a kind of monarch," as a "faux slipup [that] evinces the nuanced intellectual basis for his humor, the libertarian ben[t] that is the motive for the humor, and his dry delivery." This is consistent with the plaintiff's other argument that his statements were akin to Lenny Bruce's satiric observations, insofar as guns were one of his hobbies, he was "politically minded" and always up for a debate on political topics, including the right to bear arms, and had "found the bullets discussed in his vehicle while cleaning it out to comply with school rules" and "showed a picture of a bullet as part of a thoughtful meditation on the substance of gun rights . . . ." The plaintiff further argues that this sense of humor was "consistent with statements [that his father] made to police," noting that the plaintiff was "knowledgeable about many things and guns in particular" but had to be counseled " 'about saying the appropriate things during conversation.' " Although this evidence might well bear on the plaintiff's subjective intent in making the statements at issue, the trial court aptly noted that such evidence is immaterial, insofar as whether the statements constituted a true threat is an objective inquiry not requiring evidence of intent to threaten. See *State* v. *Taupier*, supra, 330 Conn. 173.

[20] We emphasize that our true threat analysis in the present case is limited to this record as reflected by the lower burden of proof in civil cases, and, consistent with the decision of the state's attorney not to prosecute in this case; see footnote 5 of this opinion; we take no position on whether the facts of the present case would have provided a sufficient basis for criminal liability under several potentially applicable statutes; see, e.g., *State* v. *Taupier*, supra, 330 Conn. 154; particularly given the much higher burden of proof in criminal cases. See *In re George T.*, 33 Cal. 4th 620, 639, 93 P.3d 1007, 16 Cal. Rptr. 3d 61 (2004) ("[A] [m]inor's reference to school shootings and his dissemination of his poem in close proximity to the Santee school shooting no doubt reasonably heightened the school's concern that [the] minor might emulate the actions of previous school shooters. Certainly, school personnel were amply justified in taking action following [a fellow student's] e-mail and telephone conversation with her English teacher, but that is not the issue before us. We decide . . . only that [the] minor's poem did not constitute a criminal threat.").

[21] Some prominent commentators are concerned that "[c]urrent college students are often ambivalent, or even hostile, to the idea of free speech on campus," and have expressed "surprise" about "how much the students wanted campuses to stop offensive speech and trusted campus officials to have the power to do so. A 2015 survey by the Pew Research Institute [indicated] that four in ten college students believe that the government

should be able to prevent people from publicly making statements that are offensive to minority groups. The most recent studies demonstrate that students continue to wrestle with how best to value free speech and inclusivity, with more than half of students valuing diversity and inclusivity above free speech, more than half supporting bans on hate speech, and almost a third supporting restrictions on offensive speech." (Footnote omitted.) E. Chemerinsky, "The Challenge of Free Speech on Campus," 61 Howard L.J. 585, 588 (2018); see also, e.g., M. Papandrea, "The Free Speech Rights of University Students," 101 Minn. L. Rev. 1801, 1803 (2017) (Rejecting application of government speech doctrine with respect to student speech because, "[a]lthough it should be clear that students, particularly college and university students, do not speak for the university, institutions of higher education are increasingly caving to various constituencies inside and outside of the university who believe that they do. Rather than appreciating the traditional role of the university as the quintessential marketplace of ideas, students, alumni, and the public frequently appear to believe that whenever a school tolerates offensive speech, the university is endorsing those viewpoints.").

Given this significant debate with respect to the vitality of freedom of speech on twenty-first century college campuses, it is understandable that the plaintiff attempts to frame his statements and gestures as those of a provocateur arguing in support of the right to bear arms, with his expulsion the result of offending the sensibilities of the university's snowflakes. See *Doe* v. *Rector & Visitors of George Mason University*, 149 F. Supp. 3d 602, 627 (E.D. Va. 2016) ("In short, controversial and sometimes offensive ideas and viewpoints are central to the educational mission of universities. It follows that university students cannot thrive without a certain thickness of skin that allows them to engage with expressions that might cause distress or discomfort . . . . The coddling of the nation's young adults by *proscribing* any expression on a university campus that is likely to be distressing or discomforting does not protect the work . . . of the school; such rules frustrate the mission of the university." [Emphasis in original; internal quotation marks omitted.]). The record of the present case is, however, squarely devoid of any evidence supporting that interpretation of the facts and, instead, supports the finding that the plaintiff's conduct was, in fact, reasonably interpreted as a true threat. See also footnotes 17 and 18 of this opinion and accompanying text.

[22] We note that the material and substantial disruption of school activities standard articulated in *Tinker* v. *Des Moines Independent Community School District*, 393 U.S. 503, 513, 89 S. Ct. 733, 21 L. Ed. 2d 731 (1969), has been used, in connection with the physical safety analysis of the more recent "BONG HiTS 4 JESUS" case; *Morse* v. *Frederick*, 551 U.S. 393, 397, 407–408, 127 S. Ct. 2618, 168 L. Ed. 2d 290 (2007); to permit administrative response to threats in both public universities and high schools without running afoul of the first amendment, even without consideration of whether those threatening statements rise to the level of true threats. See, e.g., *Ponce* v. *Socorro Independent School District*, supra, 508 F.3d 772 ("[W]hen a student threatens violence against a student body, his words are as much beyond the constitutional pale as yelling 'fire' in crowded theater . . . and such specific threatening speech to a school or its population is unprotected by the [f]irst [a]mendment. School administrators must be permitted to react quickly and decisively to address a threat of physical violence against their students, without worrying that they will have to face years of litigation second-guessing their judgment as to whether the threat posed a real risk of substantial disturbance." [Citation omitted.]); *Wisniewski* v. *Board of Education*, 494 F.3d 34, 38 (2d Cir. 2007) ("Although some courts have assessed a student's statements concerning the killing of a school official or a fellow student against the 'true threat' standard of *Watts* . . . we think that school officials have significantly broader authority to sanction student speech than the *Watts* standard allows. With respect to school officials' authority to discipline a student's expression reasonably understood as urging violent conduct, we think the appropriate [f]irst [a]mendment standard is the one set forth by the Supreme Court in *Tinker* . . . ." [Citations omitted.]), cert. denied, 552 U.S. 1296, 128 S. Ct. 1741, 170 L. Ed. 2d 540 (2008); *Doe* v. *Rector & Visitors of George Mason University*, 132 F. Supp. 3d 712, 729–30 (E.D. Va. 2015) (after concluding that speaker's threat to shoot himself was not true threat because it did not threaten harm to his ex-girlfriend or "to anyone else besides" himself, court permitted additional discovery and deferred consideration of claim pending development of record regarding whether text message at issue originated on or off campus,

and whether university interests as expressed in code of conduct justified expelling student); *J.S.* v. *Bethlehem Area School District*, 569 Pa. 638, 673–75, 807 A.2d 847 (2002) (concluding that offensive student website, although not true threat, caused "actual and substantial disruption of the work of the school," thus permitting school to impose disciplinary action pursuant to *Tinker*).

The defendants' brief and oral argument before this court initially suggested that they asked us to apply the *Tinker* standard in a college setting, which presents a significant question of constitutional law given some potentially unclear language and quotations of *Tinker* in, among other cases, *Healy* v. *James*, supra, 408 U.S. 189. See *Tatro* v. *University of Minnesota*, 816 N.W.2d 509, 519 n.5 (Minn. 2012) (declining to consider issue but noting that "controversy exists over whether the free speech standards that developed in K-12 school cases apply in the university setting"); K. Sarabyn, "The Twenty-Sixth Amendment: Resolving the Federal Circuit Split over College Students' First Amendment Rights," 14 Tex. J. C.L. & C.R. 27, 32 (2008) (discussing circuit split and arguing that twenty-sixth amendment to United States constitution instituted "age-based bright line" for full citizenship for eighteen year olds that "creates, for the purposes of free speech, a corresponding bright line between primary and secondary schools on the one hand, and universities on the other"); compare *McCauley* v. *University of the Virgin Islands*, 618 F.3d 232, 247 (3d Cir. 2010) ("Public universities have significantly less leeway in regulating student speech than public elementary or high schools. Admittedly, it is difficult to explain how this principle should be applied in practice and it is unlikely that any broad categorical rules will emerge from its application. At a minimum, the teachings of *Tinker* . . . and other decisions involving speech in public elementary and high schools, cannot be taken as gospel in cases involving public universities."), with *Yeasin* v. *Durham*, 719 Fed. Appx. 844, 852 (10th Cir. 2018) (observing that language from *Healy* "suggests that the Supreme Court believes that [*Tinker*'s material and substantial disruption] test applies in the university setting"), and *Ward* v. *Polite*, 667 F.3d 727, 733–34 (6th Cir. 2012) (suggesting that such standards can account in practice for differing levels of maturity between college and public school students). Having concluded that the trial court correctly determined that the plaintiff's statements and gestures were a true threat, we leave this issue to another day, particularly given the defendants' subsequent clarification at oral argument that they cited *Healy* in their brief only for the proposition that the college setting is a unique part of the factual "constellation" that informs whether the plaintiff's statements may be objectively understood to be a true threat.

---