******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* EDWARD F. TAUPIER
(AC 42115)

Keller, Prescott and Harper, Js.

*Syllabus*

Convicted, on a conditional plea of nolo contendere, of five counts of threat-
ening in the second degree in connection with posts he made on Face-
book that contained several threatening statements directed toward
Superior Court judges and court employees, the defendant appealed.
The defendant had been convicted of similar charges in 2014 in connec-
tion with sending a threatening e-mail to a Superior Court judge during
his contentious divorce proceedings. In 2017, while on house arrest and
while his appeal from his prior conviction was pending in our Supreme
Court, the defendant posted several statements on Facebook that threat-
ened the Cromwell Police Department and called for the killing of judges
and court employees and the arson of courthouses. The trial court denied
the defendant's motion to dismiss, concluding that a jury reasonably
could find that the defendant's statements, in light of the context in
which they were made, were not protected by the first amendment
because they were advocacy directed at inciting or producing imminent
lawless action and were likely to do so and because the statements
constituted true threats. On appeal to this court, the defendant claimed
that the trial court improperly denied his motion to dismiss because
the statements were not true threats and, thus, were constitutionally
protected free speech. *Held* that the trial court properly denied the
defendant's motion to dismiss, as there was probable cause to support
continuing a constitutional prosecution against the defendant under
each count for threatening to commit a crime of violence in reckless
disregard of the risk of causing such terror; the uncontested facts in
the record, viewed in the light most favorable to the state, would allow
a person of reasonable caution to believe that at least five of the defen-
dant's statements were highly likely to be perceived by a reasonable
person as serious threats of physical harm, the defendant's history of
having a contentious relationship with certain judges and judicial
employees, his prior conviction for similar threats, the details contained
in the defendant's statements that illustrated how seriously he consid-
ered exacting revenge against those affiliated with the court system,
the reactions to the defendant's statements, especially that of a court
employee identified in one of the statements, who immediately reported
the post to the authorities on the same day he discovered the posts,
and the defendant's failure to express contrition for his statements
thereafter and his additional statements of hostility toward Superior
Court judges and court employees supported a determination that the
statements reasonably could be interpreted as serious expressions of
intent to inflict harm against judges and court employees.

Argued October 15, 2019—officially released June 9, 2020

*Procedural History*

Information charging the defendant with five counts
each of the crimes of inciting injury to person or prop-
erty and threatening in the second degree, brought to
the Superior Court in the judicial district of New Lon-
don, geographical area number ten, where the court,
*Green, J.*, denied the defendant's motion to dismiss;
thereafter, the state entered a nolle prosequi as to the
charges of five counts of inciting injury to person or
property; subsequently, the defendant was presented
to the court, *Carrasquilla, J.*, on a conditional plea of
nolo contendere to five counts of threatening in the
second degree; judgment of guilty in accordance with

the plea, from which the defendant appealed to this court. *Affirmed.*

*Norman A. Pattis*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *David J. Smith*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. This case asks us to apply the "true threats" doctrine to assess whether the first amendment protects from criminal prosecution a person who posted on Facebook a series of statements that, among other things, advocated the killing of judges and the arson of courthouses. We conclude that, under the circumstances of this case, such statements constituted true threats for which an individual may be convicted without violating his right to free speech.

The defendant, Edward F. Taupier, appeals from the judgment of conviction, rendered after a conditional plea of nolo contendere, of five counts of threatening in the second degree in violation of General Statutes § 53a-62. On appeal, the defendant claims that the trial court improperly denied his motion to dismiss the charges because his statements were protected speech under the first amendment to the United States constitution and article first, § 4, of the Connecticut constitution. Because we determine that at least five of the defendant's statements constituted "true threats" as a matter of law and, thus, were not protected speech, we conclude that the court properly declined to dismiss the charges to which the defendant pleaded nolo contendere and that the defendant's conviction must be affirmed.

The following procedural history and facts are relevant to the defendant's claim. The defendant has been involved for some time in a highly contentious marital dissolution proceeding in the family court involving, among other things, a custody dispute relating to the defendant's minor children. In the course of that proceeding, the defendant sent, in 2014, a threatening e-mail to other individuals regarding Judge Bozzuto, the presiding judge in his case. That e-mail contained the following statements: "(1) [t]hey can steal my kids from my cold dead bleeding cordite filled fists . . . as my [sixty] round [magazine] falls to the floor and [I'm] dying as I change out to the next [thirty rounds]; (2) [Bo]zzuto lives in [W]atertown with her boys and [n]anny . . . there [are] 245 [yards] between her master bedroom and a cemetery that provides cover and concealment; and (3) a [.308 caliber rifle] at 250 [yards] with a double pane drops [one-half inch] per foot beyond the glass and loses [7 percent] of [foot pounds] of force [at] 250 [yards]—nonarmor piercing ball ammunition . . . ." (Internal quotation marks omitted.) *State* v. *Taupier*, 330 Conn. 149, 156–57, 193 A.3d 1 (2018), cert. denied,     U.S.    , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

As a result of this e-mail, the defendant, after a trial to the court, was convicted of threatening in the first degree in violation of General Statutes § 53a-61aa (a) (3), two counts of disorderly conduct in violation of General Statutes § 53a-182 (a) (2), and breach of the

peace in the second degree in violation of General Statutes § 53a-181 (a) (3). Id., 154. Our Supreme Court subsequently affirmed the defendant's conviction after rejecting his claims that the statements contained in his e-mail were constitutionally protected free speech. Id., 155.

While he was on house arrest and his appeal from his prior conviction was pending in our Supreme Court, the defendant, in January, 2017, posted on Facebook the statements for which he ultimately was convicted in the present case. Those statements will be described in detail later in this opinion.

With respect to those statements, on August 10, 2017, the state obtained a warrant charging the defendant with five counts of inciting injury to person or property in violation of General Statutes § 53a-179a and five counts of threatening in the second degree in violation of § 53a-62. Following the defendant's arrest and arraignment on these charges, the defendant filed, pursuant to Practice Book § 41-8 (5), (8) and (9), a motion to dismiss the charges against him. See also General Statutes § 54-56. In his motion, the defendant asserted that the statements he posted on Facebook were constitutionally protected speech, pursuant to the first and fourteenth amendments to the United States constitution and article first, § 4, of the Connecticut constitution.[1] Specifically, he contended that, as a matter of law, his statements did not rise to the level of advocacy of imminent lawless action as defined in *Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S. Ct. 1827, 23 L. Ed. 2d 430 (1969), or "true threats" as defined in *Virginia v. Black*, 538 U.S. 343, 359–60, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003).

On February 8, 2018, the court conducted a hearing on the defendant's motion to dismiss. At that hearing, no witnesses testified. The defendant represented that, for purposes of adjudicating his motion to dismiss, he did not contest the facts that were contained in the affidavit accompanying the arrest warrant (affidavit). Accordingly, the court relied solely on the averments contained in the affidavit to assess whether the defendant's statements on Facebook were constitutionally protected.

In a memorandum of decision dated May 23, 2018, the court denied the motion to dismiss. In doing so, the court construed the facts in the light most favorable to the state. The court also separately analyzed the factual averments contained in the affidavit as they related to the five counts of inciting and as they related to the five counts of threatening in the second degree. The court ultimately concluded that a jury reasonably could find that the defendant's statements, in light of the context in which they were made, were not protected by the first amendment because they (1) were advocacy directed at inciting or producing imminent lawless

action and were likely to do so, and (2) they constituted true threats.

The defendant and the state subsequently entered into a plea agreement that was accepted by the court on September 5, 2018. Pursuant to that agreement, the state entered a nolle prosequi on each of the five counts of inciting and the defendant pleaded nolo contendere to five counts of threatening in the second degree, conditioned on the defendant retaining his right to appeal the court's denial of his motion to dismiss the charges. See Practice Book § 61-6 (a) (2) (A). The court accepted the defendant's conditional plea of nolo contendere after concluding that the prior ruling on the defendant's motion to dismiss would be dispositive of the case. The court, in accordance with the plea agreement, then imposed on the defendant a total effective sentence of five years of incarceration, execution suspended after four months, and three years of probation. This appeal followed.

I

The defendant's principal claim[2] on appeal is that the court improperly denied his motion to dismiss because the statements contained in the affidavit were not true threats and, thus, were constitutionally protected free speech. We disagree.

The affidavit sets forth the following relevant facts: "2. That on Wednesday, January 25, 2017, Superior Court Chief Judicial Marshal Relford Ward of the [j]udicial [d]istrict of [Middlesex] contacted the Connecticut State Police Troop F in Westbrook to request an [i]nvestigation into communications received by court staff that they believed to be threatening in nature.

"3. That on Wednesday, January 25, 2017 . . . Trooper First Class Reid . . . met with and interviewed Chief Clerk Jonathan Field of the [j]udicial [d]istrict of [Middlesex]. Field reported that on Wednesday, January 25, 2017, at approximately [12 p.m.] he received a phone call from a concerned citizen regarding Facebook posts [he or she] had viewed and found to cause concern for Field and others at the court and [the] Cromwell Police Department. Field said the concerned citizen identified the posts [to be] from the Facebook profile of Edward Taupier. . . . Field reported that upon reading the posts, he found them to be very disturbing and he stated he considered the posts to be a threat to his own safety and possibly to others at Middlesex Judicial District Court. . . .

"4. . . . Detective Dunham searched the name 'Edward Taupier' on Facebook and was able to locate and view the profile page that contained the posts . . . of concern to Field: 'I JUST GOT NOTICE OF CONTEMPT FROM THE STATE [WEBSITE] WITHOUT GETTING OFFICIAL SERVICE . . . . I GUESS THE JEWS THAT RUN THE MIDDLETOWN [CLERK'S]

OFFICE (JOE BLACK - JONATHAN FIELD) DON'T NEED TO GET OFFICIAL SERVICE TO SCHEDULE A HEARING. THIS IS WHY WE NEED TO START KILLING WITH LOVE THOSE THAT VIOLATE THE CIVIL RIGHTS OF SOCIETY THAT ARE JUDGES WHO HAPPEN TO PRACTICE THE JEWISH FAITH' (posted [on January 9, 2017]) 'CROMWELL POLICE DUPED BY MENTALLY ILL EX TO THINK CHILDREN ARE ENDANGERED. . . . THEY SAY THEY DON'T NEED WARRANTS TO COME IN HOME. . . . POLICE DON'T NEED WARRANTS, THEY WILL NEED BODY BAGS NEXT TIME.' (posted [on January 8, 2017]) KILL COURT EMPLOYEES AND SAVE THE COUNTRY. . . . Stop driving the SUV and save a planet . . . this is what a liberal would say . . . .' (posted [on January 9, 2017]). This post also included a reply from 'Edward Taupier' that was a repost of an 'internet meme' (photograph with words or phrases) that referenced Judge Elizabeth Bozzuto. The content of the 'internet meme' includes the text 'JUDGE BOZZUTO FOR LIBERTY TREE CHALLENGE' 'The tree of liberty must be refreshed from time to time with the blood of patriots and tyrants. Thomas Jefferson' The comment, added above the picture [of] 'Edward Taupier,' is 'Nominate Judge Bozzuto to Liberty Tree Refreshment Challenge. Spill some blood, save a tree!'

"5. . . . 'Edward Taupier's' post on [January 9, 2017, states], 'I JUST GOT NOTICE OF CONTEMPT FROM THE STATE [WEBSITE] WITHOUT GETTING OFFICIAL SERVICE . . . I GUESS THE JEWS THAT RUN THE MIDDLETOWN [CLERK'S] OFFICE (JOE BLACK - JONATHAN FIELD) DON'T NEED TO GET OFFICIAL SERVICE TO SCHEDULE A HEARING. THIS IS WHY WE NEED TO START KILLING JUDGES. . . .' [This post] suggests [inflicting] violence against judges and a follower ('Jennifer Mariano') of 'Edward Taupier' agreed to join him by responding 'I had someone else in mind, but we can start with the judges.'

"6. That Detective Dunham viewed numerous posts and comments on 'Edward Taupier's' Facebook profile page from the present going back as far as December 15, 2016, that call for 'killing judges,' 'burning courts' and advocating violence against court employees'. . . .

* * *

"13. That Facebook records showed several concerning posts, some threatening in nature that this affiant observed by reviewing the Facebook records under the screen name of Edward Taupier. The posts observed on January [8] and January [9], 2017 were previously identified by Detective Dunham and Trooper First Class Reid. The posts on January [6], [11], [12], [13] and [14] were newly identified.

"14. That on January [6], 2017, at [12:34:59 a.m.], the following message was posted on Taupier's Facebook.

'856 days [as a] political prisoner by Dan Fucktard Malloy – with [J]udge Gold and Brenda Hans.' . . .

"16. That also on January [8], 2017, at [9:43:29 p.m.], Edward Taupier added [seven] new photographs onto his Facebook account with the following message 'Cromwell Police duped by mentally ill ex to think children are endangered . . . . They say they don't need warrants to come in home. . . . Police don't need warrants, they will need body bags next time.' These photographs were added to the timeline photos and contained an upload IP address . . . . These photographs appeared to be of Edward Taupier, his two kids and their dog.

"17. That on January [9], 2017 at [5:04:28 p.m.] the user 'Edward Taupier' . . . posted the following text on his Facebook account. 'I just got notice of contempt from the state [website] without getting official service, I guess the [J]ews that run the Middletown [clerk's] office (Joe Black – Jonathan Field) don't need to get official service to schedule a hearing . . . . This is why we need to start killing judges . . . .' This post received a response at [5:07:21 p.m.] from user Jennifer Mariano . . . who stated, 'I had someone else in mind, but we can start with the judges.' This post followed with a posted status at [5:06:08 p.m.] that stated the following: 'I just got notice of contempt from the state [website] getting official service . . . . I guess the [J]ews that run the Middletown [clerk's] office (Joe Black – Jonathan Field) don't need to get official service to schedule a hearing . . . this is why we need to start killing with love those that violate the civil rights of society that are judges who happened to practice the [J]ewish faith. . . .' This post followed a response at [5:06:46 p.m.] from user Edward Taupier . . . stating 'kill court employees and save the country. . . . stop driving the SUV and save a planet. . . . this is what a liberal would say . . . .' This post received a response from user Adrienne Baumgartner . . . at [5:07:29 p.m.] stating 'for that comment [E]d you no doubt could get arrested [and] also [have it] use[d] against you in [your] custody case.' User Adrienne Baumgartner continued with another response that stated, 'you really should either edit or delete that.' User Edward Taupier . . . responded at [5:13:56 p.m.] by posting Free Speech containing the Internet meme of Judge Bozzuto for liberty tree challenge.

"18. That on January [11], 2017, at [8:07:45 p.m.] user Edward Taupier . . . posted the following text: 'I was given [five years] for disturbing [the] peace . . . no judicial retaliation in [Connecticut] with [j]udges . . . [by the way, Judge] Devlin said he felt sorry for the cop . . . and wanted to make it right despite the girl and her family wanting the maximum . . . [I'm] on $1.3 [million] bond for disturbing the peace . . . kill every one of these judges.'

"19. That on January [12], 2017 at [3:28:17 p.m.] user Edward Taupier . . . posted the following text 'we the public have no trust in the [Connecticut] judiciary . . . time to burn the courts down!!'

"20. That on January [13], 2017, at [1:27:57 a.m.] the following posted status appeared on Taupier's Facebook page 'News flash I am incarcerated-house arrest for 860+ days, like DT-Rip.' This was followed by a response from user Edward Taupier . . . stating 'for disturbing peace on 1.3 million dollar bond.' User Edward Taupier continued and stated '[J]udge David [P.] Gold lives in Middlefield . . . if you want to ask him why at his house.'

"21. That on January [14], 2017, at [1:57:35 p.m.] the following memory was shared from two years ago on Taupier's Facebook page. '[Connecticut] courts destroy this every sec of every day! . . . The family courts in [Connecticut] are run by Beth Bozzuto, the mother [of] destroying families across the state! Time to burn down the courts.'

"22. That according to the State of [Connecticut] Judicial [Branch] website Edward Taupier was found guilty by a [j]ury on October [2], 2015, for threatening [in the first] [d]egree, [two counts of] [d]isorderly [c]onduct . . . and [b]reach of [the] [p]eace [in the second] [d]egree.

"23. . . . Vanessa Valentin, who is Edward Taupier's [p]robation [o]fficer . . . confirmed that the Facebook posting on Taupier's Facebook page on January [13], 2017, was correct regarding the days mentioned in his posted status for the house arrest. Valentin also confirmed that Judge Gold was the sentencing judge in Taupier's criminal case. . . .

\* \* \*

"27. That an inquiry into the protection order registry indicated an active protection order against Edward Taupier. The order was effective as of [January 15, 2016] and listed Judge Elizabeth Bozzuto as the protected person. The protection order did not have a set expiration date. The conditions of the protective order were [the following]: Do not assault, threaten, abuse, harass, follow, interfere with, or stalk the protected person (CT01). Stay away from the home of the protected person and wherever the protected person shall reside (CT03). Do not contact the protected person in any matter, including by written, electronic or telephone contact, and do not contact the protected person's home, workplace or others with whom the contact would be likely to cause annoyance or alarm to the protected person (CTO5). . . .

\* \* \*

"35. *That this affiant believes Facebook posts on January [8], January [9], January [11], January [12] and*

*January* [*14*], *2017 were threatening in nature.* These posts threaten the Cromwell Police Department, call for the killing of judges, court employees and [the] burning of . . . courts. This affiant also believes that these posts advocate, encourage and incite violence against persons and property. In addition, Edward Taupier has been previously arrested for similar crimes, [including] [t]hreatening [in the first] [d]egree, [d]isorderly [c]onduct and [b]reach of [the] [p]eace [in the second] [d]egree by the [s]tate [p]olice.

"36. That a State Police Record Check (SPRC) showed the following arrest and convictions for Edward Taupier . . . [t]hreatening [in the first] [d]egree, [two counts of] [d]isorderly [c]onduct . . . and [b]reach of [the] [p]eace [in the second] [d]egree.

"37. That based on the aforementioned facts and circumstances, the affiant believes that probable cause [exists] and requests that an arrest warrant be issued for Edward Taupier . . . charging him with inciting [i]njury to [p]ersons [in] violation of [§] 53a-179a (5 counts) and [t]hreatening [in the second degree in] violation of [§] 53a-62 (5 counts).'"[3] (Emphasis added.)

A

We begin our analysis with the standard of review applicable to the defendant's claim. The defendant's "motion to dismiss . . . properly attacks the jurisdiction of the court, essentially asserting that the [state] cannot as a matter of law and fact state a cause of action that should be heard by the court. . . . Accordingly, [o]ur review of the trial court's ultimate legal conclusion and resulting [decision to deny] . . . the motion to dismiss [is] de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Cyr*, 291 Conn. 49, 56, 967 A.2d 32 (2009); see also *State* v. *Pelella*, 327 Conn. 1, 9 n.9, 170 A.3d 647 (2017) (affording plenary review to trial court's decision to grant defendant's motion to dismiss). With respect to a motion to dismiss in a criminal case on the ground that the conduct alleged by the state is protected as free speech, our Supreme Court also has stated: "The standard to be applied in determining whether the state can satisfy this burden in the context of a pretrial motion to dismiss under General Statutes § 54-56 and Practice Book § 41-8 (5) is no different from the standard applied to other claims of evidentiary sufficiency. General Statutes § 54-56 provides that [a]ll courts having jurisdiction of criminal cases . . . may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial. When assessing whether the state has sufficient evidence to show probable cause to support continuing prosecution [following a motion to dismiss under § 54-56], the court must view

the proffered [evidence], and draw reasonable inferences from that [evidence], in the light most favorable to the state. . . . The quantum of evidence necessary to [overcome a motion to dismiss] . . . is less than the quantum necessary to establish proof beyond a reasonable doubt at trial . . . . In [ruling on the defendant's motion to dismiss], the court [must] determine whether the [state's] evidence would warrant a person of reasonable caution to believe that the [defendant had] committed the crime. . . . Thus, the trial court must ask whether the evidence would allow a person of reasonable caution, viewing the evidence presented in the light most favorable to the state, to believe that the statement at issue was highly likely to be perceived by a reasonable person as a serious threat of physical harm. If that evidence would support such a finding—regardless of whether it might also support a different conclusion—then the motion to dismiss must be denied." (Citations omitted; emphasis omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Pelella*, supra, 327 Conn. 18–19.

Although the state agrees that this court should engage in plenary review of the trial court's ultimate conclusion that the defendant's speech constituted true threats that were not protected by the first amendment, it asserts that the trial court's "factual findings" in this case are subject to the "clearly erroneous" standard of review that is typically employed to review a trial court's findings of fact. We are not persuaded by the state's assertion.

In this case, the trial court did not make any findings of fact. The court did not hear any testimony at the hearing on the motion to dismiss and did not make any credibility determinations. Instead, the court engaged in a legal review of the uncontested factual averments contained in the affidavit, viewed in the light most favorable to the state, in order to determine whether a person of reasonable caution could view the defendant's statements as true threats. In these circumstances, the clearly erroneous standard simply does not apply and no deference to the trial court's recitation of the facts is required.[4] See *State* v. *Lewis*, 273 Conn. 509, 516–17, 871 A.2d 986 (2005) ("[a]lthough we generally review a trial court's factual findings under the 'clearly erroneous' standard, when a trial court makes a decision based on pleadings and other documents, rather than on the live testimony of witnesses, we review its conclusions as questions of law"); see also *State* v. *Pelella*, supra, 327 Conn. 9 n.9 (engaging in de novo review of facts where trial court not required to make any credibility or other factual findings).

We also highlight two issues regarding the record in this case that make our review of the defendant's conviction more difficult. First, the affidavit in the record recites approximately ten statements that the

defendant made on Facebook. The record is unclear, however, regarding which five statements recited in the affidavit constitute the statements on which the defendant was convicted of five counts of threatening in the first degree.[5] Accordingly, in our view, as long as we are able to conclude that the affidavit recites five statements made by the defendant that can be characterized as true threats, it is of no moment that other of the defendant's statements recited in the affidavit do not rise to the level of a true threat. Counsel for the defendant conceded as much during oral argument to this court.[6]

Second, the record also is unclear as to the statutory subsection and subdivision of § 53a-62 under which the defendant was charged and convicted.[7] When the court put the defendant to plea and conducted its plea canvass of him, neither the court nor the defendant specified that he was pleading nolo contendere to a particular statutory subsection or subdivision of § 53a-62.[8] In addition, the information did not specify the subsection or subdivision of § 53a-62 under which the state charged the defendant. Accordingly, in light of the defendant's failure to clarify with the trial court the subsection or subdivision of § 53a-62 to which he was pleading nolo contendere, this court must affirm his conviction if we determine that at least five of the statements described in the affidavit can be characterized as unprotected true threats prohibited by *any* subsection or subdivision of § 53a-62.

For purposes of our analysis, we assess whether the defendant's five statements constituted unprotected true threats under § 53a-62 (a) (2) (B).[9] This means that we must assess whether there was probable cause to support continuing a constitutional prosecution against the defendant under each count for "threaten[ing] to commit [a] crime of violence in reckless disregard of the risk of causing such terror . . . ." General Statutes § 53a-62 (a) (2) (B).

B

Having established this court's standard of review and having addressed other issues germane to our review of the defendant's claim on appeal, we now consider the merits of the defendant's claim that the trial court improperly denied his motion to dismiss because his statements were not true threats as a matter of law and were, indeed, protected speech under the first amendment to the United States constitution. In essence, the defendant argues that none of the statements that he made that are set forth in the affidavit constitute true threats because an objective listener would not readily interpret these statements to be true threats.[10] Moreover, the defendant asserts that the court improperly denied his motion to dismiss because the affidavit, even when viewed in the light most favorable to the state, would not allow a person of reasonable

caution to believe that at least five of his statements were highly likely to be perceived by a reasonable person as a serious threat of physical harm. We are not persuaded.

We begin with a review of the first amendment principles applicable to statutes that criminalize threatening speech. "The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade [of] ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." (Internal quotation marks omitted.) *Haughwout* v. *Tordenti*, 332 Conn. 559, 570, 211 A.3d 1 (2019).

"Thus, for example, a [s]tate may punish those words [that] by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . Furthermore, the constitutional guarantees of free speech and free press do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except [when] such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . . [T]he [f]irst [a]mendment also permits a [s]tate to ban a true threat." *State* v. *Krijger*, 313 Conn. 434, 449, 97 A.3d 946 (2014).

"[T]rue threats . . . encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . .

"[W]e must distinguish between true threats, which, because of their lack of communicative value, are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected.

. . . In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners. . . .

"[T]o ensure that only *serious* expressions of an intention to commit an act of unlawful violence are punished, as the first amendment requires, the state [actor] must do more than demonstrate that a statement *could* be interpreted as a threat. When . . . a statement is susceptible of varying interpretations, at least one of which is nonthreatening, *the proper standard to apply is whether an objective listener would readily interpret the statement as a real or true threat; nothing less is sufficient to safeguard the constitutional guarantee of freedom of expression.* To meet this standard [the state actor is] required to present evidence demonstrating that a reasonable listener, familiar with the entire factual context of the defendant's statements, would be highly likely to interpret them as communicating a genuine threat of violence rather than protected expression, however offensive or repugnant." (Citations omitted; emphasis added; internal quotation marks omitted.) *Haughwout* v. *Tordenti*, supra, 332 Conn. 571–72. In determining whether an objective listener or reader would consider a statement to be a true threat, our inquiry is more dependent on whether the statement reasonably could be interpreted as a *serious expression* of intent to inflict harm rather than whether the statement conveys an intent to *imminently* inflict harm. See *State* v. *Pelella*, supra, 327 Conn. 11–17.

In analyzing whether the trial court properly denied the defendant's motion to dismiss, we consider the following five statements that the defendant made in January, 2017, and that are described in the affidavit: (1) his January 9, 2017 Facebook post, in which he, in part, stated, "THIS IS WHY WE NEED TO START KILLING WITH LOVE THOSE THAT VIOLATE THE CIVIL RIGHTS OF SOCIETY THAT ARE JUDGES WHO HAPPEN TO PRACTICE THE JEWISH FAITH"; (2) his January 9, 2017, Facebook post, in which he, in part, stated, "KILL COURT EMPLOYEES AND SAVE THE COUNTRY"; (3) his January 11, 2017 Facebook post, in which he, in part, stated "kill every one of these judges"; (4) his January 12, 2017 Facebook post, in which he, in part, stated, "time to burn the courts down!!"; and (5) his January 14, 2017 Facebook post, in which he, in part, stated, "[t]ime to burn down the courts."[11] In sum, these five statements consist of alleged threats to kill judges and court employees and to burn courthouses. Indeed, in the absence of any factual context, these

statements, viewed in the light most favorable to the state, reasonably could be interpreted by themselves as serious expressions of the defendant's intent to inflict harm against judges and court employees.

We are mindful, however, that "a determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening." *State* v. *Krijger*, supra, 313 Conn. 453. Thus, our Supreme Court has stated that "[a]lleged threats should be considered in light of their entire factual context . . . ." (Internal quotation marks omitted.) *State* v. *Pelella*, supra, 327 Conn. 12. Moreover, our Supreme Court has identified several factors that a court may use to assess the factual context in which an alleged threat is made, including (1) the history of the relationship between the person who made the alleged threat and the person or group to whom it was addressed, (2) the reaction of the statement's recipients, and (3) whether the person who made the statement showed contrition immediately after the statement was made. Id., 12, 20–22 (in determining whether statement is true threat, reviewing court should consider history of relationship between defendant and threatened person and reaction of statement's listener or reader); *State* v. *Krijger*, supra, 457–59 (whether defendant was immediately contrite after making alleged threat is a factor in determining whether objective listener would interpret statement as true threat); *State* v. *Cook*, 287 Conn. 237, 256, 947 A.2d 307 (considering relationship between defendant and threatened person to determine whether "the evidence necessarily was insufficient to support a finding that the defendant's statements and conduct amounted to a true threat"), cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008); *State* v. *DeLoreto*, 265 Conn. 145, 156–57, 827 A.2d 671 (2003) (in determining whether statement is true threat, surrounding events and reaction of listeners should be considered). Having assessed the entire factual context in which these five statements were made, we conclude for the following reasons that these statements reasonably could be interpreted as serious expressions of intent to inflict harm, and thus, an objective listener could interpret them as true threats.

1

Parties' Prior Relationship

In determining whether the defendant's five statements about killing judges and court employees and burning courthouses are serious expressions of intent to inflict harm on these groups, we first consider the relationship between the defendant and the judges and court employees, which are the groups of individuals whose his statements concern. See *State* v. *Pelella*,

supra, 327 Conn. 20–21. We conclude that the history of this relationship supports a determination that these statements constituted serious expressions of intent to inflict harm on judges and court employees.

Significant to our assessment of this factor is that the defendant had *previously been convicted for sending a threatening e-mail about a judge.* See *State* v. *Taupier,* supra, 330 Conn. 156–57, 164. Indeed, the defendant had undergone a contentious divorce proceeding and had made threatening remarks about Judge Bozzuto, the judge presiding over the proceeding. In that case, our Supreme Court observed that there was a "contentious history between the defendant and Judge Bozzuto . . . ." Id., 184. Moreover, in that case, the court stated that the trial court could "reasonably . . . [infer] . . . that the defendant harbored [animosity and frustration] toward the family court system, which Judge Bozzuto represented." Id., 192. Thus, prior to making the five statements in which he allegedly threatened to kill judges and court employees and to burn courthouses, the defendant already had a contentious relationship with at least one judge.

Furthermore, the defendant's other statements described in the affidavit add context to the threatening nature of the five statements under review and support a conclusion that the defendant had a contentious relationship with the court system that was colored by the defendant's frustration with the manner in which his family matter was being adjudicated. Indeed, even while on house arrest for making threatening statements about Judge Bozzuto in 2014, he *continued* to express hostility toward her in his January, 2017 Facebook posts. In one post, the defendant stated that "the family courts in [Connecticut] are run by Beth Bozzuto," and then he referred to Judge Bozzuto as "the mother [of] destroying families across the state . . . ." In another post, the defendant "[n]ominate[d] Judge Bozzuto [for] the Liberty Tree Refreshment Challenge." He stated that "[t]he tree of liberty must be refreshed from time to time with the blood of patriots and tyrants" and then called for "[s]pill[ing] some blood [to] save a tree . . . ."

His disdain for judges, however, was not limited to Judge Bozzuto. Indeed, the defendant also expressed contempt and hostility toward two other judges with whom he had prior dealings. In one post, the defendant wrote disapprovingly of Judge Devlin, stating, "I was given [five years] for disturbing [the] peace . . . no judicial retaliation in [Connecticut] with [j]udges . . . [by the way, Judge] Devlin said he felt sorry for the cop . . . and wanted to make it right despite the girl and her family wanting the maximum . . . [I'm] on $1.3 [million] bond for disturbing the peace. " The defendant also made a statement about Judge Gold, who presided over his sentencing following his first conviction. In

one post, he wrote, "News flash I am incarcerated-house arrest for 860+ days, like DT-Rip . . . for disturbing peace on 1.3 million dollar bond." He then continued, "[J]udge David [P.] Gold lives in Middlefield . . . if you want to ask him why at his house."

The defendant's hostility toward the court system manifested in statements that he made about others affiliated with the court system. Indeed, in one post, he alluded to receiving notice of a hearing in an improper manner, which he blamed on two judicial employees. In this post, the defendant stated, "JUST GOT NOTICE OF CONTEMPT FROM THE STATE [WEBSITE] WITHOUT GETTING OFFICIAL SERVICE, I GUESS THE JEWS THAT RUN THE MIDDLETOWN [CLERK'S] OFFICE (JOE BLACK - JONATHAN FIELD) DON'T NEED TO GET OFFICIAL SERVICE TO SCHEDULE A HEARING."

Moreover, the details contained in the other statements in the affidavit and those statements for which he had been previously convicted weigh in favor of concluding that the five statements under review were, indeed, serious expressions of intent to inflict harm on judges and court employees. In particular, the detail laden statements that the defendant made about Judges Bozzuto and Gold support this conclusion.

With respect to Judge Bozzuto, the defendant investigated where she lived and described, in detail, a plan to fire bullets into the window of her master bedroom. See *State* v. *Taupier*, supra, 330 Conn. 156–57. Specifically, he stated, " '[Bo]zzuto lives in [W]atertown with her boys and [n]anny . . . there [are] 245 [yards] between her master bedroom and a cemetery that provides cover and concealment'; and . . . 'a [.308 caliber rifle] at 250 [yards] with a double pane drops [one-half inch] per foot beyond the glass and loses [7 percent] of [foot pounds] of force [at] 250 [yards]—nonarmor piercing ball ammunition . . . .' " Id. Similarly, the defendant researched where Judge Gold lived and, on Facebook, the defendant posted the town in which Judge Gold resided so that readers could go to his home to ask him why he sentenced the defendant in the way that he did.

The details contained in these statements, which included the towns in which these judges reside and a well calculated plan to fire into Judge Bozzuto's master bedroom, weigh against concluding that the five statements under review were merely "spontaneous outburst[s], rooted in the defendant's anger and frustration, [which, by themselves, are] insufficient to establish that [the statement] constituted a true threat." *State* v. *Krijger*, supra, 313 Conn. 459. Rather, these details reflected a degree of planning or research and, thus, support an interpretation of the statements under review as serious expressions of the defendant's intent to harm those affiliated with the court system.

In sum, the defendant's 2017 Facebook posts indicate that his disdain for the court system had not abated since he sent a threatening e-mail about Judge Bozzuto in 2014. Indeed, despite being convicted for statements that he made in 2014 about Judge Bozzuto, the defendant *continued* making statements in which he expressed his hostility toward her. In addition to what he stated about Judge Bozzuto, he made statements about others affiliated with the court system, including Judge Devlin, Judge Gold, Black and Field, as well as Jewish judges and court employees, generally. Moreover, the details contained in some of the defendant's statements illustrate how seriously he considered exacting revenge against those affiliated with the court system. Viewing the uncontested facts in the affidavit in the light most favorable to the state, we conclude that the defendant's history of having a contentious relationship with certain judges and judicial employees, as well as his detail laden statements about them, support a determination that the five allegedly threatening statements under review reasonably could be interpreted as serious expressions of intent to inflict harm against judges and court employees.

2

Reaction of the Statement's Recipient

Next, we consider the reaction of those subjected to the defendant's remarks. This consideration, too, weighs in favor of concluding that the defendant's five statements about killing judges and court employees and burning down courthouses reasonably could be interpreted as serious expressions of intent to inflict harm.

In determining whether a statement is a true threat, although we ask whether an *objective* listener or reader would interpret it as such, the subjective reaction of the statement's listener or reader is a factor that this court may consider in determining what an objective listener's or reader's interpretation might be. See *State* v. *Krijger*, supra, 313 Conn. 459–60. In weighing this factor, we are mindful that "the listener's reaction of concern or fear need not be dramatic or immediate, and the apparently mixed emotions of the listeners are not dispositive." *Haughwout* v. *Tordenti*, supra, 332 Conn. 581. A court, however, may conclude that this factor weighs against determining that an objective listener would not interpret a statement as a true threat if, after listening to or reading the statement, the listener or reader delays in reporting it to authorities, responds to the statement's maker in an antagonistic manner, or states that he or she did not believe that the statement's maker had threatened to harm him or her. See *State* v. *Krijger*, supra, 313 Conn. 459 n.12 (defendant's remarks not true threat, in part, because person at whom alleged threat was directed waited two days to report threat

to police); cf. *State* v. *Moulton*, 310 Conn. 337, 369 n.26, 78 A.3d 55 (2013) ("the fact that [the listener] took no immediate action following the defendant's [alleged threat] and waited [two days] . . . to [report] the matter [is] . . . relevant evidence as to whether the [defendant's statement] was perceived as a real or true threat"). But see *State* v. *Taupier*, supra, 330 Conn. 158–59, 191–92 (defendant's statement in e-mail is true threat, even though reader of e-mail waited several days to report it).

Moreover, assessing the reactions of those who hear or read the statement is instructive in determining the extent to which the alleged threat has generated "the social costs of . . . apprehension and disruption directly caused by the threat . . . ." *State* v. *Pelella*, supra, 327 Conn. 17. Indeed, speech with significant social costs is more likely to fall under a category of content that may be restricted because it is "of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Virginia* v. *Black*, supra, 538 U.S. 358–59; *State* v. *Pelella*, supra, 10.

The reactions to the defendant's Facebook posts are the sorts of feelings of fear and the disruptions that courts have sought to prevent by not providing shelter to statements that are true threats under the umbrella of the first amendment. See *Haughwout* v. *Tordenti*, supra, 332 Conn. 571. Indeed, the defendant's January 9, 2017 post, in which he called for court employees to be killed, drew swift condemnation. One Facebook user replied, "for that comment [E]d, you no doubt could get arrested [and] also [have that] use[d] against you in [your] custody case." She continued, "you really should either edit or delete that."[12]

On January 25, 2017, a concerned individual, who wished to remain anonymous, contacted Field about statements posted on Facebook by the defendant that this individual "found to cause concern for Field and others at the court and the Cromwell Police Department."[13] After reading copies of the posts that the concerned individual sent to him, Field, who was named in one of the defendant's posts, "found them to be very disturbing and . . . stated [that] he considered the posts to be a threat to his own safety and possibly to others at [the] Middlesex Judicial District Court." Indeed, Field was so concerned by the post containing his name, that he reported it to the authorities on the same day that the concerned individual had contacted him.

Viewing the uncontested facts in the affidavit in the light most favorable to the state, we conclude that the reactions to the defendant's statements, especially that of Field, who worked for the court system and was named in one of the posts, weigh in favor of concluding that the defendant's five statements reasonably could

be interpreted as serious expressions of intent to inflict harm against judges and court employees.

### 3

### The Defendant's Contrition

Finally, we assess the extent to which the defendant expressed contrition for making the alleged threat and the temporal proximity of the contrition to when the threat was made. Our Supreme Court has stated that a "defendant's contrition immediately following [an alleged threat being made] is decidedly at odds with the view that, just moments beforehand, [the defendant] had communicated a serious threat to inflict grave bodily injury or death on [the allegedly threatened person]." *State* v. *Krijger*, supra, 313 Conn. 458. If the defendant was contrite immediately after making the alleged threat, this may indicate that the defendant's statement was merely "a spontaneous outburst, rooted in the defendant's anger and frustration, [which, by itself, is] insufficient to establish that [the statement] constituted a true threat." Id., 459. Indeed, in *Krijger*, our Supreme Court determined that the fact that the defendant in that case "immediately . . . apologized for his behavior" weighed against concluding that his statement was a true threat. See id., 457–59.

In the present case, however, the defendant not only expressed no contrition immediately after January 9, 2017,[14] but he made *many more* threatening statements on and after that date. In this case, the defendant's conduct after making his first allegedly threatening statement in January, 2017, is, indeed, a far cry from the defendant's immediate contrition in *Krijger*. See id., 457–58. Viewing the uncontested facts in the affidavit in the light most favorable to the state, we conclude that the third factor weighs in favor of concluding that the defendant's five statements reasonably could be interpreted as serious expressions of intent to inflict harm against judges and court employees. Having reviewed the factual context of the defendant's five statements, we conclude that they reasonably could be interpreted as serious expressions of intent to inflict harm against judges and court employees and that an objective listener or reader could interpret these statements as true threats.

Because the uncontested facts in the affidavit before the court, viewed in the light most favorable to the state, would allow a person of reasonable caution to believe that at least five of the defendant's statements in the affidavit were highly likely to be perceived by a reasonable person as serious threats of physical harm, we conclude that there was probable cause to support continuing a constitutional prosecution against the defendant under each count for "threaten[ing] to commit [a] crime of violence in reckless disregard of the risk of causing such terror." General Statutes § 53a-62

(a) (2) (B). Thus, the trial court properly denied the defendant's motion to dismiss.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Although the defendant referenced the state constitution in his motion to dismiss, he did not independently brief a state constitutional claim or argue that the state constitution provides greater protection of speech than that provided by our federal constitution. The defendant's motion to dismiss also appears to contain a scrivener's error by referring to article first, § 7, of the state constitution. The defendant represents in his brief on appeal that he had intended to refer to article first, § 4. In any event, presumably because the defendant did not independently brief a state constitutional claim, the trial court did not address whether the defendant's statements were protected by our state constitution.

The defendant, on appeal, claims that his statements that are described in the affidavit are protected speech under article first, §§ 4, 5, and 14, of the Connecticut constitution because those provisions require that, in order for a statement to be classified as an unprotected true threat, the statement's maker must have made the statement with a specific intent to terrorize the target of the threat. Our Supreme Court, however, rejected this same claim. See *State* v. *Taupier*, supra, 330 Conn. 174–75. In *Taupier*, our Supreme Court stated that "the Connecticut constitution does not require the state to prove that a defendant had the specific intent to terrorize the target of the threat before that person may be punished for threatening speech directed at a[n] . . . individual." Id. Thus, we reject this claim on its merits in light of *Taupier*; see id.; and need not address it in further detail.

[2] At oral argument before this court, the defendant conceded that the only claim that he makes on appeal is that the trial court improperly denied his motion to dismiss because the statements contained in the affidavit were not *true threats* and, thus, constituted speech that was constitutionally protected. Accordingly, we address only the five counts charging the defendant with threatening in the second degree in violation of § 53a-62 and do not address the five counts charging him with inciting injury to person or property in violation of § 53a-179a.

[3] In the information that it filed, the state reiterated that the defendant's statements that resulted in him being charged with five counts of threatening in the second degree were made on January 8, 9, 11, 12, and 14, 2017.

[4] In support of its assertion that this court must accept the trial court's subsidiary factual findings unless they are clearly erroneous, the state relies on *State* v. *Krijger*, 313 Conn. 434, 447, 97 A.3d 946 (2014). That reliance is misplaced. The defendant in *Krijger* appealed from a judgment of conviction rendered after a jury trial, in which the jury heard witnesses, made credibility determinations, and found facts. Thus, *Krijger* involves a different procedural posture from the present case.

[5] When the court conducted the plea canvass of the defendant, the state recited the factual basis underlying the defendant's written plea of nolo contendere as follows: "[I]n early January . . . 2017, court personnel in the Middletown courthouse were alerted to some information that had been posted online . . . that they considered very threatening to various employees of the courthouse there.

"During the course of the investigation, it was learned that approximately from January 8, 2017, going on to approximately January 14, 2017, the defendant posted and allowed to continue to be posted various threats to various employees of the state.

"Specifically, there were comments that police would be in body bags the next time they came without a warrant. There were threats directed specifically to kill the court employees at these courts. There were threats to kill the judges of the court, and with some identifying features. I don't want to put the names of them, but of specific judges that were listed on that.

"There was also threats to . . . burn down the courthouse. And in fact, he did that twice, a specific threat to burn down the courthouse, threatened the court employees, including judges, with bodily harm. And at one point, I would note, gave out the town where one of the judges resided.

"Taken together, Your Honor, the threats to specifically harm specific employees, a specific place to do damage, and obviously, cause fear to the people that work there, the state would say that those charges would satisfy the requirements, at this point anyway, for the charges of threatening."

[6] See footnote 11 of this opinion for the methodology that we used to select

the five statements that we assess for purposes of our true threats analysis.

[7] General Statutes § 53a-62 provides in relevant part: "(a) A person is guilty of threatening in the second degree when: (1) By physical threat, such person intentionally places or attempts to place another person in fear of imminent serious physical injury, (2) (A) such person threatens to commit any crime of violence with the intent to terrorize another person, or (B) such person threatens to commit such crime of violence in reckless disregard of the risk of causing such terror . . . ."

[8] "The Court: All right. And the state's recitation regarding the plea agreement, is that your understanding of the plea agreement that you are submitting today?

"[The Defendant]: Yes. And I can appeal. That's correct, right?

"[Defense Counsel]: Yes.

"The Court: Okay. So, Mr. Taupier, you have filed your plea under nolo contendere. And by doing so, you're saying that you don't contest the case, and believe that it's in your best interest to enter a plea of nolo contendere and accept the proposed disposition, rather than risk going to trial and potentially face a greater sentence if convicted, is that correct, sir?

"[The Defendant]: Yes.

"The Court: All right. And you understand that I will still be making a finding of guilty though?

"[The Defendant]: Yes.

* * *

"The Court: All right. And did your attorney explain to you what you're pleading guilty to, sir? *You're pleading guilty to five counts of threatening in the second degree.*

"[The Defendant]: *Yes.*

"The Court: All right. Did your attorney explain to you the elements of each crime that you're pleading guilty to?

"[The Defendant]: Yes.

"The Court: And did he go over with you the evidence which would prove each element beyond a reasonable doubt?

"[The Defendant]: Yes.

* * *

"The Court: Okay. And did he go over with you the terms of the plea agreement, sir?

"[The Defendant]: Yes." (Emphasis added.)

[9] We select this particular subdivision because it requires proof of recklessness rather than specific intent and, therefore, is most easily satisfied. Under this subdivision, the defendant's five statements are clearly unprotected true threats for which there is probable cause to believe that he threatened to commit a crime of violence (i.e., murder and arson) with reckless disregard of the risk of causing terror.

[10] The defendant argues that, in order to criminalize speech, the speech must meet *both* the standard of advocacy of imminent lawless action, as set forth in *Brandenburg* v. *Ohio*, supra, 395 U.S. 447–48, *and* that of true threats, as set forth in *Virginia* v. *Black*, supra, 538 U.S. 359–60. We disagree.

Our Supreme Court has stated that advocacy of imminent lawless action and true threats theories of criminal liability are distinct. See *State* v. *Parnoff*, 329 Conn. 386, 394–95, 405, 186 A.3d 640 (2018). In *Parnoff*, the court declined to consider whether the defendant's words constituted true threats because the state pursued the case under an advocacy of imminent lawless action theory of criminal liability and not a true threats theory. See id. Indeed, to consider whether a statement is a true threat by using the same analysis used to determine whether a statement constitutes advocacy of imminent lawless action is the equivalent of forcing a " 'square peg [into a] round hole' . . . ." Id., 405. Thus, for the reasons articulated by our Supreme Court, we disagree with the defendant and conclude that a person's statement may, indeed, be a true threat as a matter of law while not constituting advocacy of imminent lawless action.

[11] Although the record is unclear regarding which five statements recited in the affidavit constitute the statements on which the defendant was convicted of five counts of threatening in the second degree; see part I A of this opinion; the affidavit states that Facebook posts made by the defendant on January 8, 9, 11, 12, and 14, 2017, were "threatening in nature." There are seven Facebook posts made by the defendant on these dates that are described in the affidavit. At oral argument before this court, the defendant conceded that, when reviewing his claim, this court could analyze the statements he made on these dates for purposes of determining whether the court properly denied his motion to dismiss the charges.

In the foregoing analysis, we conclude that at least five of these statements could be characterized as true threats. We take no position on whether the remaining statements in the affidavit constitute true threats as a matter of law.

[12] We note that, in addition to the user who condemned the defendant's call to kill court employees, another user appeared encouraged by the defendant's call to kill judges. Indeed, in response to the defendant's post, this other user wrote, "I had someone else in mind, but we can start with the judges."

[13] The affidavit does not specify the amount of time that lapsed between the concerned individual reading the defendant's statements and his or her reporting them to Field on January 25, 2017.

[14] The defendant published one Facebook post on January 6, 2017, and one on January 8, 2017. Of the five statements we analyze in this opinion, the earliest was made on January 9, 2017. Thus, for purposes of our analysis, we assess the manner in which the defendant behaved (i.e., subsequent Facebook posts he made) from January 9 to 14, 2017, which is the date of the last of the defendant's Facebook posts described in the affidavit.

———————————————